No. 80,764

STATE OF KANSAS, *Appellee*, v. LEVI LOVE, JR., *Appellant*.

(986 P.2d 358)

Opinion filed July 9, 1999.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Joel W. Meinecke*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Levi Love, Jr. appeals from his convictions and sentences on the charges of first-degree murder and attempted murder. The defendant assigns three errors that he contends requires reversal of his convictions: (1) failure to suppress eyewitness testimony, (2) insufficiency of evidence supporting his convictions, and (3) the admission of hearsay evidence. We affirm.

The murder victim was the defendant's former girlfriend, LaTonya Ward. The victim of the attempted murder was a companion of Ward, Darryl Peppers. Events leading up to the crimes occurred in Topeka on March 23, 1997.

Peppers was visiting his mother when Ward telephoned and asked him to walk her home. Peppers agreed to walk her to her mother's house close by. As they walked, a white Grand Am pulled up next to them. Peppers testified that a man inside the car said something to Ward about license tags. Ward denied having the tags. Over a hearsay objection at trial, Peppers stated that after the driver departed, Ward told him the driver was "Levi." Peppers testified that he did not recognize the name.

When Peppers and Ward arrived at her mother's house, Ward knocked on the door. Peppers, who was by the sidewalk, noticed that the white Grand Am was parked near the house. Peppers saw a person whom he later identified as the defendant get out of the car and walk up to Ward. According to Peppers, the defendant was still talking about tags and Peppers heard Ward say, "I'll get your tags. I'll get your tags."

Peppers testified that he turned away from the conversation because he did not think it was any of his business. Suddenly, he heard a gunshot. He immediately began running. Then he heard another gunshot and the entire right side of his body became numb. Peppers collapsed into the street. According to Peppers, the defendant then walked over to him as he lay in the street and pointed a gun at his head. Peppers told the defendant that he was just a friend walking Ward home, had no involvement in the incident, and that he had kids at home. When the defendant stated that Peppers could identify him, Peppers assured the defendant he could not do so. Peppers testified that at this point, he could see the person and tried to memorize his face.

The defendant got into the Grand Am and drove away. Peppers then felt people lifting him. He heard someone yell, "He's coming back, he's coming back!" and was dropped back into the street. The Grand Am ran over his stomach and hips and drove away. He passed out momentarily and awoke to find that he was being lifted out of the street again.

Peppers was taken to the hospital where he was hospitalized for nearly a month for various injuries. Ward's body was found near the front door of her mother's house. She died of a bullet wound to the left side of the neck.

The defendant was arrested and charged with first-degree murder in the death of Ward and with attempted murder in the attack on Peppers. In a pretrial motion, the defendant sought to suppress the pretrial identification of him by Peppers because the photographic lineup leading to the identification was impermissibly suggestive. After a full hearing, the trial court denied his motion. Following a trial, the defendant was convicted of both crimes, leading to this appeal. Additional facts will be discussed as necessary to resolve the issues presented.

Eyewitness Identification

A two-step approach is used to decide whether an eyewitness identification should be excluded. Initially, the court determines whether the procedure used in making the identification was impermissibly suggestive; if so, then the court examines whether, un-

der the totality of the circumstances, the impermissibly suggestive identification led to a substantial likelihood of irreparable misidentification which would deny due process. *State v. Skelton*, 247 Kan. 34, 39-40, 795 P.2d 349 (1990). An eyewitness identification due process determination is a mixed question of law and fact. *State v. Edwards*, 264 Kan. 177, 189-90, 955 P.2d 1276 (1998). This court reviews the factual underpinning of a trial court's decision regarding the suppression of the eyewitness identification evidence by a substantial competent evidence standard of review and reviews the ultimate legal decision drawn from those facts de novo with independent judgment. See *State v. Bornholdt*, 261 Kan. 644, 662, 932 P.2d 964 (1997).

When a police officer arrived at the scene, Peppers told him that he did not know the person who shot him and described the person as a black male, 25 years old, 5'6" tall with short black hair and dark clothing. Alberta Shaw, Ward's mother, told police that the defendant was her daughter's ex-boyfriend and sometimes drove his sister's white car. Shaw said that Ward and Love had recently quarreled. Police also discovered that earlier that day, the defendant's sister, Mary Love, had reported that the license tag from her grandmother's car, which the defendant usually drove, had been stolen. Mary Love told officers that she saw Ward take the tag from the car.

The next day Detectives William Cochran and Kirby Lester went to Peppers' hospital room to obtain his statement. Lester had prepared a photo array for Peppers to look at by putting information into the computer regarding the defendant's appearance and asking the computer for photos of persons with the same general description. The array consisted of six photographs.

Peppers was not initially cooperative. He told the detectives he really was not paying attention to the person and only knew that the person had dark clothes and short hair. The officers showed him the photographic array and told him that his assailant was not necessarily pictured in the array. Peppers testified at the suppression hearing that he did not intend to identify anyone because of his desire to take care of things himself. However, his girlfriend, who was in the hospital room, told him that he had kids and needed

to be responsible so he decided to cooperate. He selected the defendant's photograph. When asked if the selected person was the assailant, Peppers stated, "I think so."

Peppers testified that he had previously seen two of the other persons in the array and that another person in the array did not have the same hair as his assailant. However, he also said that he had no difficulty picking out the defendant's picture because he would never forget his face. At trial, Peppers testified that the main thing he remembered about his assailant was his eyes. After Peppers made the identification, Detective Cochran told him that the person he selected was in jail.

The defendant argues that the small number of photographs used made the lineup impermissibly suggestive. He notes that Peppers had seen two of the persons in the six-person lineup before. Further, according to the defendant, one of the persons in the lineup had hair of a different length than that described by Peppers. Thus, the defendant argues that the lineup was actually a three-person lineup. He also argues that the photographic lineup was conducted so that it was impermissibly suggestive and caused a substantial likelihood of irreparably mistaken identification.

While the defendant's argument might have some validity regarding the photographs of persons Peppers had seen before, it has no validity as to the person whose hair was not "the correct length." In every lineup, an individual will have some characteristic that distinguishes the individual from the other, such as hair, shape of nose, etc. Unless the characteristic is substantially different from the prior description of the suspect, it should not affect the validity of the identification. Here, Peppers merely said that the suspect had "short hair." A look at the lineup reveals that all of the individuals in the lineup had what might be termed as short hair. Thus, at worst, the lineup was a four-person lineup rather than a three-person lineup as argued by the defendant.

In determining whether a lineup itself was unnecessarily suggestive, federal courts have used a number of factors, including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves. See *U.S. v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994); *U.S. v. Rosa*, 11 F.3d 315, 330

(2d Cir. 1993). As to the part that size of the array plays in this analysis, the Tenth Circuit Court of Appeals stated in *Sanchez*:

"After analyzing many of the federal cases dealing with due process challenges to photo arrays, we believe that the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the weight given to other alleged problems or irregularities in an array. The larger the number of pictures used in an array, the less likely it is that a minor difference, such as background color or texture, will have a prejudicial effect on selection. In such a case, the differences become diluted and less obvious among the large number of images, each of which are likely to contain some sort of minor idiosyncratic aberration. See *Simmons [v. United States*, 390 U.S. 377, 386 n.6, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968)]. This is not to say that one color picture cannot stand out in an array of one thousand black and white pictures, but on the whole, minor irregularities will be less noticeable and prejudicial as the number of photographs increases. *Id.*

"Conversely, when a relatively low number of photographs are used in an array, minor differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eyes to that picture. Common sense dictates that slight irregularities are more likely to 'jump out' at a witness reviewing a single sheet of paper with only six photographs on it than at a witness reviewing a large mug book containing hundreds of photographs. Upon continued inspection, the witness may begin to believe that the 'oddball' picture was taken under different circumstances than the others. This fact can suggest a number of things to the witness, the most dangerous of which is that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect. Thus, the number of pictures in an array relates to a fixed point on a sliding scale that can be used to determine the effect that irregularities in a picture may have had on its viewer. The lower the number of photographs used by officers in a photo array, the closer the array must be scrutinized for suggestive irregularities." 24 F.3d at 1262-63.

In *State v. Mack*, 255 Kan. 21, 28, 871 P.2d 1265 (1994), we upheld a three-person photographic array as not impermissibly suggestive. Further, other courts have held that three-person line-ups are not themselves unconstitutional standing alone. See *Messer v. Roberts*, 74 F.3d 1009, 1016 (10th Cir. 1996); *Pratt v. Parratt*, 615 F.2d 486, 487-488 (8th Cir. 1980). A review of the photographic lineup in this case indicates that all of the individuals had the same basic appearance and that there was no obvious characteristic that would cause one photograph to stand out from the others. Further, Peppers was instructed prior to viewing the lineup

that the picture of the person who shot him might not be in the lineup.

The defendant also argues that the identification was made with other persons including Peppers' girlfriend in the room which might taint the array, and that a detective told him that the person he picked was in jail, which would tend to inflate Peppers' confidence about the pick. However, the record demonstrates that comments by the detective occurred after the selection had been made. Further, there was no evidence that Peppers' girlfriend influenced his selection. At most, she told him only to cooperate with police. We conclude that the lineup was not unnecessarily suggestive and the trial court did not err in failing to suppress the identification.

Sufficiency of Evidence

The defendant's next contention concerns his alibi for the time period in which the crimes occurred. When questioned, the defendant told police that he spent part of the evening at the house of his new girlfriend, Tracy Broils, and that he borrowed his sister's car to go to Dillons in order to purchase candles and a candleholder for a candlelight dinner with Broils. He then went to his sister's house to return the car and got a ride back to Broils' residence with his cousin Alisha Thomas.

Val Moore, the defendant's brother-in-law, stated that the defendant asked for a ride and was picked up at Broils' residence between 7 p.m. and 7:10 p.m. Moore and the defendant stopped at the defendant's grandmother's house to pick up some items and returned to the Moore residence. The defendant then took his sister's white Grand Am at 7:50 p.m. to go to the store. According to Moore, the defendant returned the car at around 8:15 p.m. Thomas confirmed that she gave the defendant a ride to Broils' residence.

Broils testified that the defendant was with her all day until approximately 7 p.m., when he left to go to the store and get some candles. She stated that the defendant returned to the house at 7:30 p.m. with a pie that his grandmother had baked and then left again a few minutes later, returning around 8:15 to 8:25 p.m. with

a candle and candleholder. She stated she knew the time because she put her children to bed at 8 p.m.

According to Broils, the defendant was wearing a brown shirt and brown pants throughout the evening, although he brought a dark nylon jacket and blue pants back from his grandmother's house. When he arrived at Broils' house, the defendant took a bath and washed his hair. While he was bathing, the defendant's grandmother called to tell him that she heard on her police scanner Ward had been shot. Broils testified that the defendant cried upon hearing the news.

Security cameras from a Dillons store near the house showed the defendant entering Dillons. The security cameras show the defendant entering at 7:56 p.m. and leaving at 8:02 p.m. The cash register receipt recorded the purchase of a candle and candleholder at 8:06 p.m. Store employee testimony established that the clocks on the registers and the cameras were not synchronized and could differ from actual time as much as 5 minutes.

The first 911 call reporting shots fired occurred at 8:18 p.m. Police arrived at the crime scene at 8:23 p.m. Detective Cochran drove several routes to gauge the time it would have taken the defendant to drive between locations. From the store to the crime scene on five different routes, the longest route took 4 minutes and 18 seconds, and the shortest route took 3 minutes, 30 seconds. From the crime scene to the defendant's sister's house on two routes, the longer route took 5 minutes, 27 seconds and the shorter route took 4 minutes, 40 seconds.

The defendant contends that the evidence was insufficient to convict him of the crimes. His claim is that it would have been impossible for him to have committed the crimes within the time frame witnesses provided.

When the sufficiency of the evidence is challenged, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997).

The defendant argues that it was not possible for him to have purchased candles and a candleholder and left Dillons at either 8:02 p.m. or 8:06 p.m., depending on whether the time on the surveillance camera or register tape is used, driven to the crime scene, and engaged in the conduct described before 8:18 when the shots were reported on the 911 call, and then driven to his sister's house and gotten a ride back to Broils' house by 8:15 to 8:25 p.m.

The defendant's argument is based on a faulty premise. While it is uncontroverted that the surveillance camera at Dillons showed the defendant leaving at 8:02 p.m. and the cash register tape recorded that the purchase was made at 8:06 p.m., it is not possible to tell which of these times, if either, were accurate. The store was close to the crime scene, perhaps as close as 3 minutes, 30 seconds away. Further, the activity engaged in by the assailant was not lengthy; rather, it consisted of driving by Ward and Peppers as they walked, talking to Ward, walking up to Ward at her mother's porch, shooting her, and then shooting Peppers. It is possible that this could have been accomplished prior to 8:18 even if the register tape time was accurate. Also, the defendant's contention that he could not then have made it to Broils' house by 8:15 to 8:25 is dependent entirely upon the accuracy of Broils' recollection of the time he arrived. She made this determination not based on looking at a timepiece but rather based on the fact that she usually put her children to bed at 8 p.m. The defendant's contention further depends on the truthfulness of Broils, who as the defendant's girlfriend, had an incentive to provide an alibi for him.

The jury was charged with evaluating the witnesses and considering the facts presented. Under the circumstances, a reasonable jury could have found the defendant guilty of the crimes charged, notwithstanding the timing issue.

The defendant also contends that the evidence was insufficient in light of the unreliability of Pepper's identification of him, the fact that at least one witness reported seeing more than one person in the car, and the failure of police to check for blood on the undercarriage of the car. However, these were all factors for the jury to consider. Even considering these factors, the evidence was sufficient to convict the defendant of the crimes charged.

## Hearsay

The defendant's final contention is that the trial court erred in allowing Peppers to testify regarding the hearsay statement of Ward that the person in the car was "Levi." The defendant argues that the statement did not satisfy the hearsay exception contained in K.S.A. 60-460(d)(3).

K.S.A. 60-460 requires that hearsay statements be excluded unless the statement qualifies under an exception. K.S.A. 60-460(d)(3) provides an exception for statements made where "the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

The statement that the person in the car was "Levi" was made by Ward who was unavailable as a witness, as she was the murder victim. Further, the statement was made immediately after she saw the person in the car at a time when her recollection was clear.

The defendant argues, however, that Ward had an incentive to falsify or distort the identity of the person in the car due to the fact that she had recently had a falling out with the defendant. This argument is without merit. It is difficult to conceive what incentive Ward might have had to tell Peppers that a person he did not know was "Levi," a name Peppers did not recognize.

We have held that when considering the hearsay exceptions for contemporaneous statements found in K.S.A. 60-460(d)(3), the presence or absence of an incentive to falsify or distort is a question of fact to be determined by the trial judge in light of all the circumstances. *State v. Hobson*, 234 Kan. 133, 158, 671 P.2d 1365 (1983). Further, we have held that the trial court is given considerable discretion in admitting statements under the hearsay exception for unavailable witnesses. *State v. Stafford*, 255 Kan. 807, 810, 878 P.2d 820 (1994).

In this case, substantial evidence supports the trial court's finding that the statement was made without an incentive to falsify or distort. The defendant has failed to establish that the trial court abused its discretion in admitting Ward's statement.

Affirmed.