No. 88,722

STATE OF KANSAS, *Appellee,* v. DAVID W. TRAMMELL, *Appellant.*

(92 P.3d 1101)

Opinion filed July 2, 2004.

*Debra J. Wilson*, capital and conflicts appellate defender, of Topeka, argued the cause and was on the briefs for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Phill Kline*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

GERNON, J.: David W. Trammell appeals his convictions for three counts of aggravated assault and one count each of aggravated robbery and theft. Trammell claims that the trial court improperly instructed the jury regarding eyewitness identifications and erroneously admitted the eyewitness identifications and a gun into evidence. Trammell also argues that the trial court should have granted his motion for a new trial based on newly discovered evidence. Finally, Trammell claims that he was denied his right to a fair trial by cumulative errors.

The events leading up to Trammel's convictions began on June 22, 1999, when 17-year-old John Loper observed someone driving the tow truck owned by the Amoco station where Loper was working. Loper asked his manager who was driving the truck. Unable to clearly identify the driver, Loper's manager told Loper to go find out. By that time, the tow truck had left the Amoco station's parking lot. Loper jumped in a rental car owned by the Amoco station and pursued the tow truck to find out who was driving it.

The tow truck driver realized Loper was following him after Loper had pursued him for several blocks. In an attempt to stop Loper's pursuit, the tow truck driver put the truck in reverse and drove towards Loper's car. Loper put his car in reverse to avoid being hit. The tow truck then proceeded forward, and Loper resumed his pursuit. Realizing that Loper continued to follow him, the tow truck driver did a U-turn through a yard and drove straight toward Loper's car. Loper again threw his car into reverse to elude the tow truck. Loper was unable to get away, and his car was rammed by the tow truck head on. Afterwards, the tow truck backed up and drove past Loper, who decided not to continue his pursuit.

Loper immediately returned to the Amoco station and reported the stolen tow truck to Overland Park police, giving a brief description of the thief. Four days later, Loper saw the thief again near the Amoco station parking lot and reported it to the Overland Park police.

On July 5, 1999, John Kase heard chains rattling outside his apartment and looked out to see an unknown person with the Amoco tow truck hooking tow chains up to his Corvette. Kase immediately went out to confront the tow truck driver, who informed Kase that he was repossessing the car. When Kase advised the driver that there were no liens on the car, the driver told Kase that he had a gun and Kase should return to his apartment. Kase cautiously remained near his car trying to figure out how to unhitch his car from the tow truck. The driver then went to the truck cab and retrieved a gun from the seat. Kase ran towards his apartment and began hollering at his neighbor to come out because someone was stealing Kase's car.

Kase's neighbor and a friend who had been in Kase's apartment came outside and observed the robber. Another of Kase's friends, John Eglich, rode up on his motorcycle as the tow truck was driving off, dragging Kase's car behind it. Kase hollered at Eglich to go after the tow truck.

Eglich chased the tow truck and Kase's car for about a half of a block before the tow truck stopped. Eglich rode up beside the driver's window of the tow truck and asked the driver what he was doing. The driver told Eglich he was repossessing the car. When Eglich told him there were no liens on the car, the driver pointed a gun at Eglich, told him to get away from the truck, and drove off. Eglich pursued the tow truck for a short distance but was unable to catch it.

Before the tow truck could get very far, the car became unhitched from the truck. The driver then drove back to Kase's apartment complex and nearly ran over Kase's neighbor, who was attempting to stop the truck, before leaving the area. Kase's car was heavily damaged, and he reported the incident to the Merriam police.

A few days later, police conducting surveillance at an Econo Lodge motel near Kase's apartment observed the stolen Amoco tow truck. A man named Scott Cross was arrested at the Econo Lodge motel, and he told the police that Trammell had stolen the tow truck.

Based on the information from Cross, the Overland Park police prepared a photographic lineup including Trammell's photograph for Loper to view. The Merriam police also prepared a photographic lineup including Trammell's photograph for Kase and Eglich to view. Although Loper viewed a different photographic lineup independent of Kase and Eglich, all three of the victims selected Trammell's photograph.

Trammell was arrested by police in Raytown, Missouri, on July 10, 1999. Trammell had a gun in his possession at the time of his arrest.

On July 25, 2001, a jury convicted Trammell of three counts of aggravated assault, one count of theft, and one count of aggravated robbery. The Kansas Court of Appeals affirmed Trammell's con-

victions. *State v. Trammell*, No. 88,722, unpublished opinion dated September 19, 2003. This court granted Trammell's petition for review.

For his first claim of error, Trammell argues that the trial court erroneously instructed the jury regarding eyewitness identification. Trammell relies on this court's recent opinion in *State v. Hunt*, 275 Kan. 811, 69 P.3d 571 (2003), for the proposition that PIK Crim. 3d 52.20 incorrectly states the law in Kansas. The *Hunt* decision was filed after Trammell's trial. Nevertheless, Trammell argues that the *Hunt* decision should be applied retroactively to his case.

Trammell did not raise an issue regarding the use of PIK Crim. 3d 52.20 before the trial court. An issue raised for the first time on appeal is not properly before the appellate court. However, appellate courts will consider constitutional issues raised for the first time on appeal if the issue falls within the three recognized exceptions. The threshold question is whether consideration of the newly asserted claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights. *State v. Williams*, 275 Kan. 284, 288-89, 64 P.3d 353 (2003).

Trammell cannot demonstrate that review of the trial court's instructions on eyewitness identification will serve the ends of justice or prevent the denial of fundamental rights. Consequently, the issue is not properly before this court.

Furthermore, Trammell's argument is based on an incorrect interpretation of *Hunt*. In *Hunt*, we considered whether a one-person show-up identification should have been excluded because it was unnecessarily suggestive and unreliable. 275 Kan. at 812-13, 815. We adopted the factors set forth by the Utah Supreme Court in *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991), for evaluating the reliability of an identification.

Trammell argues that *Hunt* discarded the previous analysis under the factors in *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), when it adopted the *Ramirez* factors. Specifically, Trammell claims that the *Ramirez* factors do not include a consideration of the witness' certainty of the identification, and that including that factor in PIK Crim. 3d 52.20 is error.

Trammell's argument is flawed. In *Hunt*, this court did not discard the prior analysis under *Biggers*. Instead, we enhanced the reliability analysis by adding the *Ramirez* factors to the *Biggers* factors, stating: "We accept the *Ramirez* model; however, our acceptance should not be considered as a rejection of the *Biggers* model but, rather, as a refinement in the analysis." 275 Kan. at 818.

Although *Hunt* suggested that a cautionary instruction be given for eyewitness identification, it did not address the validity of PIK Crim. 3d 52.20. 275 Kan. at 818. Accordingly, *Hunt* does not support Trammell's claim that PIK Crim. 3d 52.20 is erroneous.

Next, Trammell argues that the trial court should have excluded the eyewitness identifications. He claims the in-court and out-of-court identifications led to a substantial likelihood of irreparable misidentification in violation of his right to due process.

An appellate court's review of an eyewitness identification is a due process determination that involves a mixed question of law and fact. This court applies a substantial competent evidence standard when reviewing the factual underpinnings of a trial court's decision to admit or suppress an eyewitness identification. However, the ultimate legal decision drawn from those facts is reviewed using a de novo standard. *State v. Love*, 267 Kan. 600, 603, 986 P.2d 358 (1999).

The court utilizes a two-step procedure for analyzing whether an eyewitness identification should be excluded. First, the court must determine whether the procedure used for making the identification was impermissibly suggestive. If so, the court moves to the second step in the analysis and considers whether the impermissibly suggestive procedure led to a substantial likelihood of misidentification. Under the second step, the court must consider the totality of the circumstances surrounding the identification as outlined by the following *Hunt* factors:

1. The witness' opportunity to view the criminal at the time of the crime;

2. The witness' degree of attention.

3. The accuracy of the witness' prior description.

4. The level of certainty demonstrated by the witness at the confrontation.

5. The length of time between the crime and the confrontation.

6. The witness' capacity to observe the event, including his or her mental and physical acuity.

7. Whether the witness' identification was made spontaneously and remained consistent thereafter or whether it was the product of suggestion.

8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. *Hunt*, 275 Kan. at 815-18.

Trammell first attacks the out-of-court identifications, claiming that they were impermissibly suggestive. He raises two arguments. First, Trammell claims that Loper's photographic lineup was presumptively suggestive because the original lineup was unavailable at trial. Although a photocopy of the lineup was admitted, Trammell argues that the photocopy was insufficient for the court to review the suggestibility of the lineup. Second, Trammell claims that both of the photographic lineups were impermissibly suggestive because Cross, the person Trammell claims was the perpetrator, was not included in either of the lineups. Both of these arguments raise issues of first impression. The Court of Appeals decided both issues against Trammell. *State v. Trammell*, No. 88,722, unpublished opinion filed September 19, 2003.

Trammell relies on several cases from other jurisdictions to support his proposition that the failure to produce the original photographic lineup at trial is presumptively suggestive. However, all of Trammell's cases can be distinguished from this case because those courts did not have a photocopy of the lineup to review. Other courts do not consider photographic lineups to be presumptively suggestive when the original lineup is unavailable. In *State v. Lopez*, 886 P.2d 1105, 1111 (Utah 1994), the Utah Supreme Court concluded that the loss of the photographic lineup did not prevent review of the suggestiveness because there was a detailed description of the lineup in the record. In *Edmonds v. McGinnis*, 11 F. Supp. 2d 427, 436 (S.D. N.Y. 1998), the federal district court refused to find the photographic lineup presumptively prejudicial

without a showing of bad faith on the part of the prosecution. The *Edmonds* court also relied on the fact that the photographic lineup was lost after trial and after the trial court had determined it to be nonsuggestive. 11 F. Supp. 2d at 436.

Although Kansas appellate courts have not specifically considered whether a photographic lineup is presumptively suggestive if the original photos are not preserved for the record, we have considered whether the State erred when it failed to take photographs of an in-person lineup. See *State v. Slansky*, 239 Kan. 450, 455-56, 720 P.2d 1054 (1986). In *Slansky,* this court noted that it would have been a better practice to photograph the in-person lineup but concluded that the jury had sufficient evidence to determine whether the lineup identification was conducted properly. 239 Kan. at 455-56.

In this case, the photocopy of the photographic lineup and the testimony provides the court with sufficient evidence to determine whether the lineup was unnecessarily suggestive. Although the black and white photocopy is not as clear as the original color photographs, both the trial court and the appellate courts can clearly ascertain facial features and compare the individuals' characteristics. In addition, Kase and Loper testified that the individuals in the lineup looked similar to each other. Because there is evidence in the record for a court to review, there is no reason to find that the photographic lineup shown to Loper was presumptively suggestive because the original photo array was lost.

For his second argument regarding the admission of the out-of-court identifications, Trammell claims that the failure to include Cross' picture makes the photographic lineups impermissibly suggestive. Trammell claims that there is a strong inference that Cross committed the robberies because the tow truck was found where Cross was arrested. Trammell complains that the police specifically excluded Cross' photo from the lineup because Cross informed the police that Trammell committed the crimes. Trammell further argues that he has been misidentified because Cross looks just like him. Trammell, however, offers no authority for his proposition that the exclusion of Cross' photograph requires a finding that the photographic lineup was impermissibly suggestive.

A lineup or photo array identification procedure is impermissibly suggestive if the officers conducting the proceeding give the witness information that highlights one of the individuals before the selection is made or make suggestions about who the witness should select. See, e.g., *State v. Mack*, 255 Kan. 21, 28, 871 P.2d 1265 (1994); *State v. Ponds*, 227 Kan. 627, 630, 608 P.2d 946 (1980); *State v. Holloman*, 17 Kan. App. 2d 279, 284, 837 P.2d 826, *rev. denied* 251 Kan. 940 (1992). A photographic lineup is impermissibly suggestive if the photographs do not depict individuals who generally fit within the witness' description or if there is a gross disparity between the defendant's photograph and the remaining photographs or a distinctive indication of the defendant's photograph. *State v. Love*, 267 Kan. at 604-05; *State v. Ponds*, 227 Kan. at 630.

The law enforcement officers preparing the photographic lineups in this case selected individuals whose appearances were similar to Trammell's and in accordance with the witnesses' descriptions. One of the officers testified that he did not include Cross' photograph in the lineup because he did not think Cross looked like Trammell. The photographic lineups did not give the names of the individuals depicted, and the law enforcement officers did not suggest who the witnesses should choose. In fact, the officers informed the witnesses that the person may not be in the lineup. Two of the witnesses, Kase and Eglich, selected Trammell's picture instantly. Likewise, Loper was very positive in his identification, giving the officer no reason to show him any other photographs.

Contrary to Trammell's claim, the witnesses did not think Cross looked just like Trammell. Although Kase thought Cross looked similar to Trammell, he distinguished Cross' hair color and testified that Cross and Trammell did not look alike. Kase also described Cross differently than the other individuals in the photographic lineup, noting that Cross had brown hair but the men in the lineup all had blonde hair, like Trammell. Loper testified that the photograph of Cross looked similar to Trammell's but distinguished between the two, stating that Cross was not the person driving the tow truck.

The law enforcement officers preparing and conducting the photographic lineups in this case followed Kansas law. Although Cross looked similar to Trammell, the witnesses easily distinguished between the two and consistently identified Trammell as the robber. There is no reason to presume that the photographic lineups were impermissibly suggestive because Cross' picture was not included.

The Minnesota Supreme Court reached the same conclusion in *State v. Lindsey*, 632 N.W.2d 652 (Minn. 2001). In *Lindsey*, the defendant was convicted of murder and attempted murder. The defendant claimed that one of his companions committed the murder and that the photographic lineups shown to eyewitnesses were impermissibly suggestive because the companion's photograph was not included in the lineup. The *Lindsey* court found the argument to be without merit, stating that "[n]othing in the lineup or the procedures used suggests Lindsey was singled out for identification." 632 N.W.2d at 665.

Furthermore, Trammell cannot complain that he was unable to fully develop his defense that Cross committed the robberies. At the suppression hearing and at trial, Trammell extensively cross-examined the State's identification witnesses and the law enforcement officers that prepared the photographic lineups regarding Cross. In addition, Trammell admitted a photograph of Cross for the witnesses to compare with Trammell's appearance. Trammell argued his theory that Cross framed him to the jury. The adequacy of the evidence to prove Trammell's defense was a question for the jury to decide.

Next, Trammell argues that the in-court identifications should have been excluded. A reliable in-court identification will stand on its own regardless of whether it was preceded by a deficient pretrial identification. *State v. Edwards*, 264 Kan. 177, 189, 955 P.2d 1276 (1998). To determine whether an identification is reliable, this court applies the eight factors set forth in *Hunt*, 275 Kan. at 817-18.

John Loper

1. The witness' opportunity to view the criminal at the time of the crime.

Loper testified that he viewed the robber from the rear, from the side, and face to face. Loper observed the side of the robber's face for approximately 15 seconds while the robber was backing the tow truck towards him and the front of the robber's face for another approximately 20 seconds while the robber drove straight at Loper and rammed Loper's car. Loper also observed the robber as he backed the tow truck off of Loper's car and drove past him on the passenger's side.

2. The witness' degree of attention.

When the tow truck was driving toward him, Loper was alternating between looking forward and looking over his shoulder as he drove in reverse. Loper testified that the tow truck drove toward him for approximately 35 to 45 seconds, and he estimated that he was actually looking at the robber for about 20 seconds of that time. Although he admitted being excited, Loper testified that he could remember what the robber looked like, stating: "[T]hat image is just kind of in my mind."

3. The accuracy of the witness' prior description.

Loper described the robber to the police as a white male, approximately 30 years old, with blonde hair. Trammell was 32 years old at the time of the tow truck robbery. At the preliminary hearing, Loper described the robber as thin-built, with dirty brown or dirty blondish hair, a mustache, and a more rounded face. At trial, Loper described the robber as having "scraggly, dirty, blonde hair, not a real thin face but not a real chubby face," with a "[k]ind of a slender nose" and baggy eyes with dark circles under them. Each of these descriptions is consistent with the description given by Kase and Eglich. Contrary to Trammell's claim, Loper's trial description is not a description of Trammell's photograph from the photographic lineup. In the photographic lineup, Trammell's eyes appear swollen, not baggy with dark circles under them.

4. The level of certainty demonstrated by the witness at the confrontation.

At the preliminary hearing, Loper testified that he was 95 percent certain of his identification. The law enforcement officer conducting the photographic lineup with Loper testified that he did not believe there was a need to do further lineups because Loper

was very positive in his identification, giving the officer no room for doubt.

5. The length of time between the crime and the confrontation.

Loper first identified Trammell in a photographic lineup 20 days after the tow truck was stolen. However, Loper recognized the robber in the parking lot adjacent to the Amoco station 4 days after the robbery and reported it to police.

6. The witness' capacity to observe the event, including his or her mental and physical acuity.

Loper was 17 years old when the crime occurred. His full attention was directed at following the tow truck as his supervisor had instructed. Loper's sole purpose in following the tow truck was to determine who was driving it, so he was intent on seeing the driver's face. He continued to pursue the tow truck even after the robber backed towards him. Loper observed the robber during daylight hours, and his vision was unobstructed as the robber drove the tow truck head on into Loper's car. Although Loper admitted to being nervous and excited, he did not indicate that his nervousness or excitement interfered with his ability to remember the robber's face. In fact, Loper testified that he formed an image in his mind of the robber's face when the tow truck was driving toward him.

7. Whether the witness's identification was made spontaneously and remained consistent thereafter or whether it was the product of suggestion.

Loper's description remained consistent. On cross-examination at trial, Trammell attempted to demonstrate an inconsistency in Loper's description. Loper testified that the robber had an average build but had previously testified at the preliminary hearing that the robber had a thin build. However, Loper also testified that he could not see the robber's body because he was seated in the tow truck. Other than the robber's body size, Trammell has failed to point to any other inconsistencies between Loper's initial description and his in-court identifications.

8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly.

This factor requires the court to consider whether the event was ordinary and whether the witness and the criminal were of the same race. In this case, the event was far from ordinary. Loper was chasing a tow truck because he believed it was being stolen and had been instructed to find out who was driving the truck. Loper's sole purpose was to determine who was driving the tow truck and why it left the Amoco station. The record does not establish Loper's race, so the court cannot make a determination based on that detail.

Based on an analysis of the *Hunt* factors, Loper's identification was reliable. The trial court did not err when it admitted Loper's in-court identification into evidence.

## John Kase

1. The witness' opportunity to view the criminal at the time of the crime.

Kase was within 2-3 feet of the robber while he was stealing the car. He had a short conversation with the robber concerning the car and looked directly at the robber's face before the robber pulled a gun out of the truck to scare Kase back to his apartment.

2. The witness' degree of attention.

Kase was concerned that his Corvette was being stolen. His attention was focused on confronting the robber. Although he looked briefly at his car to see how to unhook the tow truck chains, he testified that he was face to face with the robber. All of Kase's attention was focused on the robber and preventing his car from being stolen.

3. The accuracy of the witness' prior description.

Kase initially described the robber as being a white male with short blond hair about 5 feet-5 inches tall and skinny. At the preliminary hearing and at trial, Trammell attempted to impeach Kase's description by pointing out that Trammell is taller than 5 feet-5 inches. Based on his observation of Trammell in the courtroom, Kase testified that Trammell appeared to be 6 feet tall but explained the height discrepancy by stating that he was slightly elevated on a drainage ditch when he encountered the robber. According to Trammell's records, he is 5 feet-9 inches tall. With

the exception of the robber's height, Kase's description remained consistent throughout the proceedings.

4. The level of certainty demonstrated by the witness at the confrontation.

Kase immediately selected Trammell during the photographic lineup. He also identified him without hesitation at the preliminary hearing more than 2 years after the robbery and at trial. When confronted with Cross' picture on cross-examination at the suppression hearing, Kase readily distinguished between Cross and Trammell, stating that Cross' picture does not look like Trammell.

5. The length of time between the crime and the confrontation.

Kase initially chose Trammell's picture in a photographic lineup 7 days after his car was stolen. His identification at the preliminary hearing occurred nearly 1 and ½ years after the robbery, and his identification at trial occurred 2 years after the robbery.

6. The witness' capacity to observe the event, including his or her mental and physical acuity.

Kase's observation of the car thief was unimpeded by physical or mental obstructions. The car was stolen at about 5 p.m. while it was still daylight. Kase was within 2-3 feet of the car thief and stood face to face with him. Although Kase testified that his adrenaline was pumping, Trammell fails to show any impairment to Kase's mental or physical acuity.

7. Whether the witness' identification was made spontaneously and remained consistent thereafter or whether it was the product of suggestion.

Trammell argues that Kase's identification was contaminated by newspaper accounts naming Trammell as the robber. This argument, however, overlooks the fact that Kase was not privy to the names of the individuals in the photographic lineup when he identified Trammell as the robber, and Trammell's picture was not included in the newspaper article.

8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly.

The theft of Kase's car was not an everyday occurrence. Kase admitted that the sound of chains drew his attention and the ensuing conflict increased his adrenaline. Kase witnessed the theft of

his car, not someone else's, so he was very alert and fully attentive to what was happening. As a result, he was able to perceive, remember, and relate the events correctly. There is nothing in the record to establish Kase's race, so the court cannot consider the impact of a cross-racial identification.

When considered in light of the totality of the circumstances, Kase's in-court identification is reliable. The trial court did not err by admitting Kase's identification of Trammell into evidence.

## John Eglich

1. The witness' opportunity to view the criminal at the time of the crime.

Eglich first observed the car thief when he drove his motorcycle up alongside the tow truck. Eglich observed the car thief face to face from a distance of approximately 1 foot when the car thief turned and looked at Eglich. Eglich had a brief conversation with the car thief about the status of the car before the thief pointed a gun at Eglich and instructed him to get away from the truck. The conversation lasted about 30 or 45 seconds.

2. The witness' degree of attention.

Eglich was chasing the car thief with his motorcycle. His attention was focused on stopping the car thief. Even after the car thief threatened Eglich with a gun, Eglich continued to follow the truck until it went up a grass hill and through a drive-through at a fast food restaurant.

3. The accuracy of the witness' prior description.

Eglich did not give the police a description of the car thief immediately after the robbery. The first time Eglich provided information to identify the car thief occurred when Eglich was shown the photographic lineup. However, Eglich was able to distinguish between Trammell's appearance at the preliminary hearing and his appearance at the time of the robbery, stating:

"When I seen the lineup with him in it, he was all beat up and I mean black eyes and stuff. . . . When I seen him the day of the incident, his eyes were bloodshot and it looked like he hadn't slept in about four days the day I seen him, so like I said, he looks a little more clean-cut now.

. . . .

"His hair is combed now and his eyes aren't—don't look like he's been on drugs for five or six days, but it looks—the rest looks the same."

4. The level of certainty demonstrated by the witness at the confrontation.

Eglich instantly selected Trammell's photograph from the photographic lineup without hesitation. Likewise, Eglich testified that he would recognize the car thief if he saw him again and readily identified Trammell at the trial.

5. The length of time between the crime and the confrontation.

Eglich selected Trammell's photograph from the photographic lineup 7 days after the incident. Eglich's in-court identification occurred 2 years after the robbery.

6. The witness' capacity to observe the event, including his or her mental and physical acuity.

Eglich testified that he confronted the car thief during the daylight and that nothing was obstructing his view of the car thief when he pulled alongside the tow truck with his motorcycle. Trammell argues that Eglich's view was obstructed by the visor on his motorcycle helmet, but Eglich testified that his visor was pushed up out of his field of vision.

7. Whether the witness' identification was made spontaneously and remained consistent thereafter or whether it was the product of suggestion.

Eglich's first identification was at the photographic lineup. He immediately selected Trammell's picture and was able to distinguish between Trammell's photograph in the lineup, his appearance at the time of the robbery, and his appearance in court. Trammell argues that Eglich's identification was contaminated by newspaper accounts. This argument overlooks the fact that Eglich was not given the names of the individuals in the photographic lineup before he identified Trammel's photograph, and Eglich did not see the newspaper articles until after he had identified Trammell in the photographic lineup.

8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly.

Eglich testified that he was excited and his adrenaline was pumping. Based on his testimony, it is fair to infer that pursuing a

possible car thief was atypical for Eglich, increasing the likelihood that he would perceive, remember, and relate the event correctly. There is nothing in the record to establish Eglich's race to determine whether there was a cross-racial identification.

Considering the totality of the circumstances in light of the *Hunt* factors, the trial court did not err when it allowed Eglich to identify Trammell in court during the trial.

## Richard Krigger

Finally, Trammell argues that the in-court identification by Kase's neighbor, Richard Krigger, was unreliable. Krigger observed the car thief standing near the tow truck before he left with the Corvette and later when the car thief drove past him again. He did not give a description to the police and did not make a pretrial identification. Krigger was 75 percent sure of his identification in court but stated that he was not sure that he would have recognized the car thief walking down the street. Krigger's statement that he would not have recognized the car thief if he had passed him on the street and the 2-year delay in making an identification invalidates the reliability of Krigger's identification. However, we find the admission of his identification to be harmless error. Harmless error occurs when the erroneous admission of evidence could not have affected the result of the trial when considered in light of other evidence that was properly admitted. *State v. Collier*, 259 Kan. 346, 353, 913 P.2d 597 (1996). In this case, the positive identifications from victims of the crimes, Loper, Kase, and Eglich, overcome any problems with the identification by Krigger, whose observation of the crimes was far more tangential than that of the three victims.

Trammell next argues that the trial court should not have admitted into evidence the gun that was found in his possession when he was arrested. The admission of evidence is within the trial court's discretion. Subject to the exclusionary rules, appellate courts review a trial court's decision to admit or exclude evidence using an abuse of discretion standard. Judicial discretion is not abused if reasonable persons could differ about the propriety of the trial court's action. *State v. Whitesell*, 270 Kan. 259, 276, 13

P.3d 887 (2000). The person claiming that the trial court abused its discretion bears the burden of establishing such an abuse. 270 Kan. at 276-77.

The admissibility of physical evidence is based on its relevance in connection with the accused and the crime charged. Physical evidence should be admitted unless it is clearly irrelevant. The jury may attribute such weight and effect as it sees fit. 270 Kan. at 277. Relevant evidence is any evidence "having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The determination of relevancy is a matter of logic and experience, not a matter of law. *State v. Gardner,* 264 Kan. 95, 104, 955 P.2d 1199 (1998). Nevertheless, there must be some material or logical connection between collateral facts and the inference or result they are supposed to establish for them to be competent. 264 Kan. at 104.

When a weapon is found in the defendant's possession and later identified as being similar to the one used in the crime, the lack of testimony positively identifying the weapon as that used in the crime goes to the weight, not the admissibility, of the evidence. *State v. Mitchell,* 220 Kan. 700, 704, 556 P.2d 874 (1976). Kase and Eglich both testified that the gun found in Trammell's possession looked similar to the one used by the car thief when the Corvette was stolen. Because the gun was identified as being similar to the gun used during the car theft and assaults, the witnesses' inability to identify it as the exact gun goes to the weight rather than the admissibility of the gun. Accordingly, the trial court did not abuse its discretion by admitting the gun into evidence.

Next, Trammell argues that the trial court erred when it denied his motion for a new trial based on newly discovered evidence. The granting of a new trial is a matter within the trial court's discretion. Judicial discretion is abused when no reasonable person would agree with the trial court's decision. See *State v. Betts,* 272 Kan. 369, 380-81, 33 P.3d 575 (2001).

Within 2 weeks of the beginning of Trammell's trial, the prosecutor learned that Trammell intended to assert that Cross committed the crimes. In response, the prosecutor prepared copies of all of the police reports involving Cross and delivered the copies to the District Attorney's records department for distribution to

Trammell's counsel. The prosecutor advised Trammell's counsel that discovery was available. However, Trammell's counsel did not receive the copies until nearly 6 weeks after Trammell's trial began.

The police reports stated that when arrested, Cross was in possession of a blue nylon bag that Cross said belonged to Trammell. Inside the blue nylon bag, police found weatherstripping from a motel room near Cross' motel room at the Econo Lodge motel where Cross was arrested. Police had previously observed Cross remove the weatherstripping in an unsuccessful attempt to break into the motel room. The police also found a cardboard box in Cross' motel room that contained paperwork from the Amoco station where the tow truck had been stolen.

Pursuant to K.S.A. 22-3501(1), a court may grant a motion for a new trial based on newly discovered evidence. However, new trials on grounds of newly discovered evidence are not favored, and such motions are to be viewed with caution. *Betts*, 272 Kan. at 380. There are two requirements that must be met before a trial court may grant a motion for new trial based upon newly discovered evidence:

"First, the defendant must establish that the newly proffered evidence is indeed 'new,' in that it could not, with reasonable diligence, have been produced at trial. Second, the evidence must be of such materiality that there is a reasonable probability that the newly discovered evidence would produce a different result upon retrial." 272 Kan. at 380.

Trammell does not allege that the State acted in bad faith by withholding exculpatory evidence. Likewise, the State does not argue that Trammell could have discovered the evidence through due diligence. This situation has been referred to as an "oversight" situation. See *State v. Kelly*, 216 Kan. 31, 36, 531 P.2d 60 (1975). The *Kelly* court stated:

"When the withholding of evidence by the prosecution is not deliberate and in bad faith and when the prosecution has not refused to honor a request for the evidence made at a proper stage of the proceedings, the defendant should be granted a new trial only if the record establishes: (1) that evidence was withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial to the defendant." 216 Kan. at 36.

Exculpatory evidence tends to disprove a fact in issue that is material to guilt. *State v. Aikins*, 261 Kan. 346, 382, 932 P.2d 408 (1997). "Evidence is material if it might have created reasonable doubt and affected the outcome of the trial." 261 Kan. at. 383. Courts apply three different standards for determining the materiality of evidence. First, there is evidence that is merely helpful to the defense. Second, there is evidence that raises a reasonable doubt as to the defendant's guilt. Third, there is evidence that creates a substantial likelihood of reversal. The proper standard for determining materiality must reflect the court's overall concern with the justice of the finding of guilt. A guilty finding is only permissible if it is supported by evidence establishing guilt beyond a reasonable doubt. Thus, if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. 261 Kan. at 383.

Trammell argues that Cross' statement about the ownership of the blue nylon bag is exculpatory and material because it proves Trammell's theory that Cross was blaming Trammell for Cross' criminal activity. Cross, however, did not state that Trammell was responsible for the attempted break-in at the motel room. Consequently, Trammell's argument is based on the inference that because the blue nylon bag belonged to Trammell, Trammell must have put the weatherstripping in it. Trammel's argument overlooks the inference that Cross could have placed the weatherstripping in a bag owned by Trammell, which begs the question of how Cross happened to be in possession of Trammell's bag. Trammell provided the answer to this question when he testified that he thought Cross was involved in stealing some of Trammell's property. Likewise, Trammell's allegation that Cross was involved in stealing Trammell's property also provides an explanation regarding Cross' possession of paperwork from the Amoco station.

The newly discovered evidence can be considered exculpatory because it tends to disprove the eyewitnesses' identification of Trammell as the robber. The evidence is helpful to Trammell because it supports his claim that Cross framed him. However, the evidence is not material in the sense that it would have created a reasonable doubt and affected the outcome of the trial. Trammell's

testimony provides an obvious explanation for Cross' possession of items that were related to Trammell. The jury could have easily inferred that Cross stole the blue nylon bag and the cardboard box along with Trammell's other possessions. When considered in light of Trammell's testimony and the testimony from the three victims who readily identified Trammell, the new evidence does not rise to the level of creating a substantial likelihood of reversal. The trial court did not abuse its discretion when it denied Trammell's motion for a new trial.

Finally, Trammell argues that his conviction should be reversed due to cumulative trial errors. This court looks at the totality of the circumstances to determine whether cumulative errors have substantially prejudiced the defendant and denied his or her right to a fair trial. However, if the evidence is overwhelmingly against the defendant, no prejudicial error may be found based on the cumulative effect rule. *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

Trammell claims the following cumulative errors: (1) erroneous admission of the pretrial identifications; (2) failure to grant a new trial to include the new exculpatory evidence; and (3) erroneous admission of the gun. Each of these claims have been determined against Trammell. Thus, he has failed to establish any errors that prejudiced his right to a fair trial.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.