240 P.3d 619
No. 102,635

STATE OF KANSAS, *Appellee*, v. ROBIN ROBERT GALYARDT, *Appellant*.

Opinion filed October 8, 2010.

*Meryl Carver-Allmond*, of Kansas Appellate Defender Office, for appellant.

*Kenneth Van Blaricum*, county attorney, and *Steve Six*, attorney general, for appellee.

Before MALONE, P.J., PIERRON, J., and BUKATY, S.J.

PIERRON, J.: Robin Robert Galyardt appeals his conviction for aggravated burglary. Galyardt argues the trial court erred in denying both his motions to suppress because the officer was out of his jurisdiction during the vehicle search and the eyewitness identification was impermissibly suggestive. He also contends the eyewitness instruction was outdated and clearly erroneous.

When Harold Windholtz went to work at the Barron Theatre in Pratt at 6 a.m. on June 15, 2008, he found the front door unlocked and heard noise in the office. Windholtz realized there was an intruder and left to call the police. Windholtz met Steve Cross outside in his truck and told him of the intrusion. As the two talked, the intruder came out the front door. Windholtz was not wearing his glasses, but he described the intruder as having long hair, gray clothing, and gloves. Cross indentified the intruder as wearing a gray shirt, black pants, black gloves, and black cap. Cross followed

the intruder's vehicle for several blocks and observed the license plate number of "103AUD." Cross returned to the theatre.

Officer Nathan Humble of the Pratt Police Department responded to Windholtz' call and investigated the break-in. He arrived at the scene at 6:11 a.m. and spoke with Windholtz and Cross. Officer Humble issued an alert for a gold car with license plate number 103AUD. Cross left for work after giving his statement. As the officers investigated the burglary, Stafford County law enforcement reported they had stopped a gold car with license plate number "103AHD." Office Humble immediately called Cross and asked if he would be available to see if the car and driver were the same he witnessed at the theatre. Officer Humble picked up Cross and they drove into Stafford County. At approximately 7:30 a.m., in a one-man show-up, Cross identified Galyardt as the person he saw leaving the theatre.

Officer Humble arrested Galyardt and in a search of his vehicle discovered instruments that would later be described as specialized burglary tools. The State charged Galyardt with burglary but later amended the charge to aggravated burglary. Galyardt filed a motion to suppress the evidence found during the search of his car, based on the officer's lack of territorial jurisdiction, and a motion to suppress the eyewitness identification testimony based on an unconstitutional identification procedure. The trial court ultimately denied both motions. The jury convicted Galyardt as charged. The trial court sentenced him to a presumptive term of 49 months' incarceration.

An appellate court reviews the district court's decision on motions to suppress using a bifurcated standard. Without reweighing the evidence, the district court's findings are reviewed to determine whether they are supported by substantial competent evidence. Then, the ultimate legal conclusion regarding the suppression of evidence is reviewed using a de novo standard. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

*Fresh Pursuit*

Galyardt first contends his arrest and the search of his car were unlawful because Officer Humble, of Pratt County, was acting out-

side his jurisdiction, in Stafford County, in violation of K.S.A. 22-2401a. At the hearing on Galyardt's motion to suppress, the trial court granted the motion, finding the arrest was improper, and consequently suppressed all items seized from the car subject to the State offering authority that a private citizen could make a search incident to an arrest. At a motion for reconsideration, the court reversed its prior ruling and held that Officer Humble was in fresh pursuit of Galyardt at the time of the arrest and search, and the motion to suppress was therefore denied.

The extraterritorial jurisdiction of municipal police officers is governed by K.S.A. 22-2401a(2)(b), which provides that law enforcement officers employed by any city may exercise their powers as law enforcement officers "in any other place when a request for assistance has been made by law enforcement officers from that place or when in fresh pursuit of a person." "Fresh pursuit" is defined in the same statute as "pursuit, without unnecessary delay, of a person who has committed a crime, or who is reasonably suspected of having committed a crime." K.S.A. 22-2401a(10)(d).

The interpretation of a statute is a question of law. This court's review of questions of law is unlimited. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (1010). The issue raised in this case is whether Officer Humble was in "fresh pursuit" of Galyardt as defined by K.S.A. 22-2401a(2)(b) when he arrested Galyardt and searched his vehicle outside of the jurisdiction of Pratt law enforcement.

In *State v. Green*, 257 Kan. 444, 901 P.2d 1350 (1995), Ottawa police officers received a report that a robbery had just taken place in Ottawa and that the suspects had proceeded north out of town. The officers drove north out of the city and later apprehended the suspects. The court, in holding that the officers were in fresh pursuit, noted that "the criminal activity that prompted the pursuit originated in Ottawa." 257 Kan. at 455; see *City of Junction City v. Riley*, 240 Kan. 614, 731 P.2d 310, *cert. denied* 482 U.S. 917 (1987) (finding that K.S.A. 1985 Supp. 22-2401a gave Junction City police officer authority to arrest suspect on military reservation for crime committed within officer's jurisdiction, when in fresh pursuit). The *Green* court noted that Kansas courts had not specifically

addressed whether an officer must chase a fleeing suspect over a jurisdictional border to be in fresh pursuit. The issue in *Green* was whether the Kansas definition of fresh pursuit required that the actual visual pursuit of the person sought originate within the officer's territorial jurisdiction. In finding fresh pursuit existed, the *Green* court stated:

"Here, the criminal activity that prompted the pursuit originated in Ottawa. Although the Ottawa officers did not chase the defendants over the jurisdictional boundary, the pursuit was continuous, uninterrupted, and without delay. The officers immediately began pursuing the defendants upon receiving a report of the robbery and a description of the suspects and their direction of flight. The officers located the vehicle within seven minutes and chased it until it stopped. The officers continuously pursued the vehicle during the entire 28-minute period between the initial report of the crime and the ultimate stop and arrest of the defendants. There was no break in the officers' efforts to apprehend the defendants or the defendants' efforts to escape." 257 Kan. at 455.

Several other cases outside of Kansas, cited in *Green*, are instructive on this issue. In *Com. v. Magwood*, 503 Pa. 169, 469 A.2d 115 (1983), city police officers received a report of an attempted robbery. An officer sought the suspect after receiving his description and direction of flight. The officer located and arrested the suspect outside the officer's jurisdictional boundary. The court held that the Pennsylvania statute, which authorized extraterritorial arrests when the officer continues in pursuit, contemplated fresh pursuit. The court found the police continuously pursued the defendant from the time of the initial report and upheld the arrest after concluding the pursuit was fresh, continuous, and uninterrupted. 503 Pa. at 175-76.

In *Charnes v. Arnold*, 198 Colo. 362, 600 P.2d 64 (1979), the Colorado Supreme Court, interpreting language identical to the Kansas fresh pursuit statute, upheld an extraterritorial warrantless arrest where the suspect was not followed across the jurisdictional boundary. In *Charnes*, a Lakewood police officer responded to a report of a hit and run accident and, upon arriving at the scene, learned that the vehicle was registered to the defendant, who lived in Denver. The officer promptly drove to the defendant's Denver address, observed the defendant pulling into his driveway, and ar-

rested him. The court concluded that although fresh pursuit obviously includes high-speed, Hollywood-style automobile chases, it also includes less dramatic police action. 198 Colo. at 364-65.

In determining if the officer was in fresh pursuit, the *Charnes* court recognized three factors: (1) whether the officer acted without unnecessary delay; (2) whether the pursuit was continuous and uninterrupted, although there need not be continuous surveillance of the suspect or uninterrupted knowledge of the suspect's whereabouts; and (3) the relationship in time of the commission of the offense, the commencement of the pursuit, and the apprehension of the suspect. Because the police responded immediately to the call and promptly pursued the only lead available, the *Charnes* court held that the officer was in fresh pursuit. 198 Colo. at 365. The *Green* court adopted these three factors for its determination of whether an officer was in "fresh pursuit." 257 Kan. 444, Syl. ¶ 5.

Galyardt contends that unless his motion to suppress is granted, all that would be needed for fresh pursuit would be an officer's broadcast or alert for a license plate. Galyardt claims this would be too broad an interpretation of the statute. We disagree with Galyardt's focus on this single fact. Galyardt fails to consider the *Green* factors and the totality of the situation. Officer Humble arrived at the theater at 6:11 a.m. The license plate and vehicle description was issued at 6:16 a.m. Officers continued to search the area for suspects. Stafford County law enforcement stopped Galyardt at 6:46 a.m. Officer Humble immediately contacted Cross, picked him up, and the identification was made at approximately 7:30 a.m. Officer Humble arrived at the Pratt County Jail with Galyardt at 8:01 a.m. In this case, Officer Humble was continuously working on this case until the time he made contact with Galyardt in Stafford County. He acted without unnecessary delay in pursuing the identification and arrest of Galyardt as the perpetrator of the aggravated burglary. His actions in this case in pursuing Galyardt amounted to less than an hour and a half from the time of the police alert to Cross' positive identification of Galyardt as the perpetrator.

We find the trial court did not err in denying Galyardt's motion to suppress his arrest and the discovery of the criminal instrumentalities during the search of his vehicle.

Since we find there was fresh pursuit, we need not address the issue of whether Officer Humble had been requested by Stafford County law enforcement to assist.

### Eyewitness Identification

Galyardt next argues the trial court erred in denying his motion to suppress Cross' eyewitness identification testimony because the one-man show-up used for Cross' identification was unnecessarily suggestive and led to a substantial likelihood of misidentification.

Review of a denial of a motion to suppress an eyewitness identification involves a mixed question of fact and law. The factual basis of the trial court's denial of the suppression motion and admission of the eyewitness identification evidence is reviewed using a substantial competent evidence standard. *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006). Substantial evidence is defined as "such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *State v. Luna*, 271 Kan. 573, 575, 24 P.3d 125 (2001). In reviewing for substantial evidence, this court does not reweigh the evidence or pass on the credibility of witnesses. See *State v. Combs*, 280 Kan. 45, 50, 118 P.3d 1259 (2005). The ultimate legal conclusion that the eyewitness identification is admissible in light of the factual findings is reviewed de novo. *Corbett*, 281 Kan. at 304.

A two-step analysis is used to determine the reliability of Cross' eyewitness identification. First, this court must determine whether the procedure used to elicit Cross' identification of Galyardt was unnecessarily suggestive. If so, the second step requires consideration of certain factors in assessing whether the unnecessarily suggestive procedure led to a substantial likelihood of misidentification. See *Corbett*, 281 Kan. at 304.

Galyardt argues the one-man show-up identification procedure was unnecessarily suggestive because Cross was told that the police wanted him to go see a possible suspect and then drove him to a place where he identified the only person in the vicinity other than

uniformed police officers. In denying Galyardt's motion, the trial court found that although show-up identifications are not favored, "the general ruling that the benefits of a prompt resolution outweigh the inherent prejudice of being the only person observed would appear to apply here." The trial court also stated that the additional identification of Galyardt's license plate added to the substantial credibility of the identification.

Here, aspects of the identification procedure were somewhat suggestive. These include: (1) Humble telling Cross that they thought they had found the car and suspect and asking him to see if he could identify the perpetrator; (2) other than the officers, Galyardt was the only person observed by Cross in the same vicinity of the car they identified; and (3) this was a one-man show-up identification. However, these factors do not cause the identification procedure to be unnecessarily suggestive.

In *State v. Alires*, 246 Kan. 635, 640, 792 P.2d 1019 (1990), our Supreme Court held that a show-up identification procedure was not unnecessarily suggestive, noting that it had previously "approved one-on-one confrontations shortly after the commission of an offense, recognizing that time is crucial when there is an eyewitness who can identify a suspect and that any delay in identification could impede the police investigation. [Citation omitted.]" The court in *State v. Trammell*, 278 Kan. 265, 270, 92 P.3d 1101 (2004), suggests that our appellate courts reach the second stage of the analysis only if the procedure used for making the identification is found to be unnecessarily suggestive. See *Corbett*, 281 Kan. at 306. We agree with the trial court that in light of the multiple identification details provided by Cross at the scene and the close similarity in the license plate identification, the identification procedure, although suggestive, was not unnecessarily suggestive. Therefore, we need not determine whether the procedure led to a substantial likelihood of misidentification. Nevertheless, we move to the second step of the analysis only to further support our conclusion and in case of further review.

The second step of the analysis requires the court to consider the reliability of the eyewitness identification based on the totality of the circumstances surrounding the identification by application

of what are now known as the *"Hunt"* reliability factors. See *Trammell*, 278 Kan. at 270-71; *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 (2003). Applying the following listed and described *Trammell/Hunt* factors, we conclude that the evidence supports the trial court's conclusion that there was not a substantial likelihood of misidentification.

*Opportunity to view/Degree of attention*: Cross had the opportunity to view Galyardt after Galyardt got into his car near the theater. Cross testified that he was paying close attention and he got a good look at Galyardt. Cross testified that he and Galyardt made eye contact as Galyardt was trying to start his vehicle. Cross followed Galyardt and got his license plate number, although one letter was misidentified as a "U" instead of an "H."

*Level of certainty*: Cross was 100% certain of his identification of Galyardt as the man that came out of the theater.

*Length of time between crime and confrontation*: Cross confronted and identified Galyardt within an hour and a half of the time Cross witnessed the commission of the crime.

*Capacity to observe the event*: Galyardt did not challenge Cross' mental or physical capacity or acuity for observing the perpetrator exiting the theater. Cross' identification of the vehicle and Galyardt were both spontaneous.

Aside from the basic nature of the one-man show-up identification procedure discussed above, nothing in the record indicates Cross' identification of Galyardt was the result of police prompting or suggestion, and his identification of Galyardt never wavered.

Having analyzed the identification procedure, we conclude the district court did not err in refusing to suppress Cross' identification of Galyardt at trial.

Last, Galyardt argues the trial court erred in giving an outdated eyewitness identification jury instruction, citing *Hunt*, 275 Kan. 811. Galyardt did not object to the instruction at trial and now claims it was clearly erroneous. Under K.S.A. 22-3414(3), no party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict unless the instruction or the failure to give an instruction was clearly erroneous. Instructions are clearly erroneous only if the

reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Carter*, 284 Kan. 312, 324, 160 P.3d 457 (2007).

The trial court gave the jury an eyewitness identification instruction identical to PIK Crim. 3d 52.20, which includes "[t]he degree of certainty demonstrated by the witness at the time of any identification of the accused" as a factor in weighing the reliability of an eyewitness identification. This factor had its genesis in an eyewitness identification reliability model adopted by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). This model was adopted by our Supreme Court in *State v. Warren*, 230 Kan. 385, 397, 635 P.2d 1236 (1981).

Galyardt argues this "witness certainty factor" was criticized and rejected as an indicator of reliability by the Utah Supreme Court in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), which was cited by our Supreme Court as the basis for a reliability model that excluded the witness certainty factor. See *Hunt*, 275 Kan. at 817-18. Nevertheless, Galyardt acknowledges that our Supreme Court has explicitly stated that the pre- *Hunt* (*Biggers*) model (which includes the witness certainty factor) has not been rejected but rather "refined" by the *Ramirez* model. See *Trammell*, 278 Kan. at 270-71 (*Hunt* court enhanced reliability analysis by adding *Ramirez* factors to *Biggers* factors); *Hunt*, 275 Kan. at 818.

The *Hunt* and *Trammell* opinions were not entirely clear whether the inclusion of a witness certainty factor in an eyewitness identification instruction should be considered error. Until our Supreme Court squarely addresses the issue, we must decline to hold that the inclusion of the witness certainty factor as an indicator of reliability of eyewitness identifications is clear error. See *State v. Reid*, 286 Kan. 494, 514-18, 186 P.3d 713 (2008). This conclusion is consistent with that of other panels of our court that have addressed this argument. See, *e.g., State v. Aguilera*, No. 101,590, unpublished opinion filed June 18, 2010; *State v. Marshall*, No. 101,641, unpublished opinion filed February 5, 2010, slip op. at 15-20, *aff'd* 294 Kan. 850 (2012). We reject Galyardt's challenge

to the eyewitness identification instruction employed in the present case.

Affirmed.