NOT DESIGNATED FOR PUBLICATION

No. 113,943

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN MATTHEW RULE, JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed January 27, 2017. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Brock R. Abbey*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., GREEN and LEBEN, JJ.

*Per Curiam*: Steven Matthew Rule, Jr., was found guilty by a jury of one count of aggravated assault with the intent to commit a felony, one count of felony theft, and one count of fleeing or attempting to elude a police officer while driving recklessly. Rule raises five issues: (1) that the trial court erred in denying his motion to suppress statements and evidence obtained after warrantless arrest; (2) that the trial court ered in denying his motion to suppress a deputy's identification of him as the driver of a stolen truck; (3) that the trial court failed to instruct the jury on the lesser included offense of attempted aggravated assault; (4) that the trial court lacked sufficient evidence to convict

1

him of aggravated assault with the intent to commit a felony; and (5) that the trial court erred in denying his motion to arrest judgment on his theft charge. Finding no merit in Rule's contentions, we affirm.

On August 25, 2014, David Hammel and E.J. Swanson were working for Landscape Consultants in Salina, Kansas. The two men were working at a building near the intersection of Crawford Street and Ohio Street. Hammel and Swanson were working out of a red Ford F-350 pickup truck with a red trailer hooked up to it. The company's logo, phone number, and town name were on both sides of the truck. Around noon, Hammel and Swanson decided to have lunch. The two workers left their truck parked behind a building they were working near. Hammel and Swanson walked to the McDonald's restaurant next door. While they were at McDonald's, Swanson and Hammel saw their work truck parked at a stoplight outside the restaurant. The truck no longer had the trailer hooked up to it. Hammel left the restaurant to find out why the truck was being moved.

The truck was stopped at a red light behind two or three vehicles. Hammel walked down the sidewalk toward the truck. While he was walking down the sidewalk, the driver of the truck looked at Hammel and "then turned the wheel to hop the curb and drove straight at" him. When the driver saw Hammel, the truck was about 30-50 feet away. When the driver jumped the curb with the truck, he was about 20 feet away from Hammel. The truck accelerated quickly towards Hammel. It was travelling somewhere around 5-10 miles per hour. Hammel believed the truck came within 3 or 4 feet of hitting him. He had to take "two or three big steps backwards," to get out of the truck's way. If Hammel had not moved, the truck would have hit him. He thought that he would be harmed if the truck were to hit him. Swanson witnessed Hammel jump out of the way of the truck from inside the McDonald's. Swanson saw the truck come "within about eight feet of [Hammel], give or take a few [feet]." An officer who reported to the scene saw

2

skidmarks on the curb, tire tracks through the grass, tire impressions on the bushes, tire marks on the sidewalk that Hammel was on, and skidmarks on the street.

Hammel was shaken by the experience. He called 911. He had trouble unlocking his cellphone because he was shaking. Hammel described the driver of the truck to the dispatcher as a white male in his mid-20s with short hair. He also thought the driver may have been wearing a white t-shirt. Hammel was unable, however, to give a description to the officer who reported to the scene. Hammel informed the officer that the event happened quickly, and he did not get a good look at the driver. Hammel believed that the incident only lasted a couple of seconds. He could see the driver well enough to know that he had never seen the driver before. Hammel was shown a photo lineup about 4 or 5 hours after the incident occurred. The lineup contained photographs of six individuals. Hammel was unable to identify any of them as the person driving the stolen truck.

Meanwhile, a deputy sheriff had responded to the area. The deputy first observed the red truck from about 25 yards away. He could see that the red truck had the Landscape Consultants logo on its side. The truck passed about 15 yards in front of the deputy. The deputy saw the driver of the truck from the shoulders up as he passed by. The deputy "got a good look at the driver for about three to four seconds." The deputy's view of the driver was from the side as he passed by. To the deputy, the driver appeared to be a white male in his late 20's or early 30's with short blondish-brown hair and whiskers. The deputy turned behind the truck and activated his emergency lights and sirens. The deputy was in an SUV with sheriff markings on it.

The deputy pursued the truck at speeds between 70 and 90 miles per hour. He followed the cloud of dust that the truck was kicking up from the gravel road it traveled down. The deputy had difficulty catching up to the truck. The truck veered off the road into an empty field. The officer followed the truck. The truck then entered an overgrown area of dried weeds and vegetation. The officer followed the tire marks through the

3

overgrown area. The officer eventually came to Gypsum Creek, where he located the truck overturned in the creek. The truck was on its roof in about 6 inches of water when the deputy reached it. The truck was empty, but there were footprints or impressions in the mud leading away from the wreck. The truck was located in a rural area about 7 or 8 miles east of Salina and 4 miles away from the nearest town.

About 5 minutes after the deputy discovered the truck, more than 10 other law enforcement officers arrived at the scene. About 20 or 30 minutes after the deputy located the truck, a Kansas Highway Patrol search airplane arrived. The responding officers also included a Kansas Highway Patrol K-9 unit. The area around the truck was surrounded and contained by law enforcement officers. The officers established a perimeter about 1/2 to 3/4 of a mile around the crash site. The perimeter was established about 10 minutes after the crash. In total, about 20 law enforcement officers were involved in the search for the driver of the stolen truck. As the search was conducted, the airplane circled overhead and relayed instructions to the officers on the ground. The officers were informed that they were searching for a white male in his late 20's or early 30's wearing a white t-shirt.

During the search, the only people in the area were law enforcement officers. One Kansas Highway Patrol trooper entered a wooded area about 100 yards from the crash site. The trooper saw Rule walking toward him at "a pretty fast pace." The trooper drew his weapon and ordered Rule to the ground. Rule complied, and the trooper handcuffed him. Rule was sweaty and had many small scrapes on his chest, as though he had been running through the brush. He also had minor scratches on his legs. The scratches were fresh. Rule was not wearing a shirt when he was found. He was only wearing camouflage boxer shorts and tennis shoes. Rule's shorts were wet, and his tennis shoes were wet and had mud on them. Rule was also breathing heavily when he was found. He told one deputy that there was no need to handcuff him because he was only out for a walk when the trooper arrested him. Rule was found about 1 hour and 15 minutes after the pursuit of the truck began. Once Rule was found, the search ended.

4

Deputies returned to the area to search for clothing, footprints, or any other signs that would assist their investigation. One deputy located footprints somewhere between 400 and 800 feet south of the crash site. The footprints left a clean impression in the dirt. The footprints matched the tread from the shoes that Rule was wearing when he was found. The deputy identified the footprints as coming from the shoes Rule was wearing by holding a photograph of the shoe next to the footprint on the ground and comparing the two. No footprints that matched Rule's shoes were found at the crash site. The deputies were also searching for a white t-shirt. The search did not turn up any items of clothing. The area that the deputies searched was covered in thick underbrush. Also, the creek had very steep embankments that were difficult for the deputies to navigate.

After Rule was arrested, the deputy who initially pursued the truck went to the Saline County Jail to identify Rule as the individual he had seen driving the truck. The deputy was told of Rule's identity as the suspect before he went to the jail. The deputy entered the jail and went to booking. Rule was being kept in an area called "the pit." The pit is an area that sits behind and below the booking desk. The pit holds the inmates who are waiting to be processed. When the deputy approached the booking counter, Rule was sitting in the pit facing away from the counter so that the deputy could not see him. The deputy asked the correction officer at the booking counter where he could find Rule. The correction officer told the deputy that Rule was in the pit. At the same time that the corrections officer was answering the deputy, Rule stood up and proclaimed, "Here I am." When Rule stood up, he was obstructed by a copy machine so that the deputy could only see him from the neck up. The deputy did not have a doubt in his mind that Rule was the individual he saw driving the truck.

Rule was charged with one count of aggravated assault with a deadly weapon or, in the alternative, aggravated assault with the intent to commit a felony; one count of felony theft; one count of fleeing or attempting to elude a police officer based on reckless driving or, in the alternative, a motor vehicle accident; one count of driving on a

cancelled, suspended, or revoked driver's license; one count of reckless driving; and one count of failure to inform interested persons of a vehicle accident involving unattended property.

Before trial, Rule moved to dismiss. He also moved to suppress statements to police and other evidence obtained following warrantless arrest. Additionally, Rule moved to suppress identification evidence at trial. The trial court denied Rule's motion to dismiss, finding that there was sufficient evidence to support the finding of probable cause to bind Rule over on the charges. The trial court granted Rule's motion to suppress statements to police in part and denied it in part. The trial court found that the officers had probable cause to arrest Rule when they found him near the truck. Finally, the trial court denied Rule's motion to suppress identification evidence at trial, finding that the deputy's identification did not present a substantial likelihood of misidentification.

The trial court dismissed the count of driving on a cancelled, suspended, or revoked driver's license at trial because of a discovery violation. Rule moved for judgment of acquittal after the State rested. The trial judge allowed the following counts to go to the jury: (1) aggravated assault with a deadly weapon or, in the alternative, with the intent to commit a felony; (2) theft; (3) fleeing or attempting to elude a police officer while engaged in reckless driving or, in the alternative, involving a motor vehicle accident; and (4) reckless driving. An instruction for the lesser included charge of assault was given to the jury with the instruction for the aggravated assault.

Rule was found guilty of (1) one count of aggravated assault with the intent to commit theft; (2) one count of theft; (3) one count of fleeing or attempting to elude a police officer while driving recklessly; (4) one count of fleeing or attempting to elude a police officer involving a motor vehicle accident; and (5) one count of reckless driving. The trial judge noted that Rule could not be convicted of both fleeing or attempting to elude a police officer while driving recklessly and fleeing or attempting to elude a police

6

officer involving a motor vehicle accident. After hearing arguments, the trial court found that the factual scenario better fit the fleeing or attempting to elude while driving recklessly than the fleeing or attempting to elude involving a motor vehicle accident. The trial court then found that Rule's conviction for reckless driving merged into the fleeing or attempting to elude conviction.

Rule filed posttrial motions for judgment of acquittal, new trial, and arrest of judgment. In his motion for judgment of acquittal Rule argued that his convictions were not supported by sufficient evidence. In his motion for a new trial, Rule argued that his convictions were not supported by sufficient evidence; the court erred in not instructing the jury on attempted aggravated assault; the court erred in not suppressing the deputy's postarrest identification of Rule; and the court erred in denying his motion to suppress based on warrantless arrest. In his motion to arrest judgment on the theft conviction, Rule argued that the complaint failed to allege the mental state required to prove felony theft. The trial court denied all of Rule's posttrial motions.

Rule was sentenced to a total controlling prison term of 48 months, with 12 months of postrelease supervision. Rule filed a timely notice of appeal, appealing all adverse rulings and decisions made by the trial court.

*Was Rule's Arrest Supported by Probable Cause?*

Rule argues that the trial court erred in denying his motion to suppress evidence obtained after his arrest because the law enforcement officers did not have probable cause to arrest him.

A trial court's decision on a motion to suppress is reviewed using a bifurcated standard. The appellate court reviews the trial court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual

7

findings, the appellate court does not reweigh evidence or assess credibility of witnesses. The trial court's final legal conclusions are reviewed using a de novo standard. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

A law enforcement officer may arrest a person without a warrant if the officer has probable cause to believe that person is committing or has committed a felony. K.S.A. 22-2401(c)(1). When an appellate court examines a motion to suppress that is based upon an alleged lack of probable cause, it considers the totality of the circumstances from the standpoint of an objectively reasonable police officer. *State v. Ingram*, 279 Kan. 745, 752, 113 P.3d 228 (2005). The totality of the circumstances includes the information and the fair inferences drawn therefrom, known to the officer when the arrest occurred. *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, 20, 290 P.3d 555 (2012). The arresting officer's subjective belief that probable cause existed is not determinative of the issue. *Ingram*, 279 Kan. at 752. This court has defined probable cause "as a quantum of evidence which leads a prudent person to believe an offense had been or was being committed. [Citation omitted.]" *State v. Keenan*, 50 Kan. App. 2d 358, 364, 325 P.3d 1192 (2014), *aff'd* 304 Kan. 986, 377 P.3d 439 (2016).

Rule concedes that the law enforcement officers had reason to believe the crimes of theft and fleeing and eluding had occurred. Rule argues, though, that no reasonable person would have believed that he had committed the crimes because no quantum of evidence linking him to the commission of the crimes existed. Rule specifically argues that his mere proximity to the area where the stolen truck was found did not establish probable cause for the officer to arrest him.

It is true, as Rule points out in his brief, that "mere proximity to others who are independently suspected of criminal activity, without more, does not establish probable cause." *State v. Hill*, 281 Kan. 136, 146, 130 P.3d 1 (2006). Rule also correctly notes that an individual's mere proximity to illegal drugs in a social location does not by itself

establish probable cause to arrest that individual. See *State v. Beaver*, 41 Kan. App. 2d 124, 129, 200 P.3d 490 (2009). Finally, Rule cites *State v. Fewell*, 286 Kan. 370, 380, 184 P.3d 303 (2008), to support the proposition that physical proximity to others independently suspected of criminal activity does not establish probable cause on its own.

The cases that Rule relies on can be distinguished from his situation. First, Rule was not found in the presence of any other individuals. Thus, the arresting officer was not relying on Rule's proximity to another individual suspected of criminal activity like the officers in *Hill* and *Fewell*. Second, Rule was not found in a social setting like the individual in *Beaver*. Instead, Rule was found in a rural setting, 4 miles from the nearest town. For these reasons, Rule's situation is sufficiently different than those cases he cites. Rule's proximity to the stolen truck was not the only fact known to the officer when he arrested Rule.

Rule's argument that his mere proximity to the stolen truck was not enough to establish probable cause to arrest ignores the totality of the circumstances. Rule's mere proximity to the stolen truck was not the only fact known to the arresting officer, though it may have been one fact the officer heavily considered in developing probable cause. The totality of the circumstances must be examined to determine whether probable cause to arrest existed, based on the facts that were known to the arresting officer and the reasonable inferences he could draw from those facts when the arrest occurred. If the facts known to the officer when the arrest occurred would lead a reasonably prudent person to believe that Rule had stolen the truck, then the arrest of Rule was supported by probable cause.

The following facts were known to the officer when Rule's arrest occurred: (1) The law enforcement officers had established a perimeter around the stolen truck; (2) the officers were searching for a white male in his late 20's or early 30's; (3) Rule was found in a wooded area about 100 yards from the stolen truck; (4) Rule matched the description

9

of a white male in his late 20's or early 30's; (5) Rule was walking briskly or nearly running toward the arresting officer; (6) Rule was wearing boxer shorts and tennis shoes with no shirt; (7) Rule had scratches and scrapes on his body; (8) Rule's shoes were muddy; (9) Rule was sweaty; (10) Rule's shoes and shorts were wet; (11) the nearest town was 4 miles away; and (12) there were no other individuals found near the stolen truck.

Based on the facts known to the officer when the arrest occurred and the inferences that can be fairly drawn from those facts, the officer had probable cause to believe that Rule had committed the felony theft of the truck that the law enforcement officers were there investigating. The officers did not only rely on Rule's proximity to the stolen truck but also on the previously outlined facts. The totality of the circumstances known to the officer when the arrest occurred would have led a reasonably prudent person to infer that Rule was the individual who had stolen the truck. Thus, the trial court properly denied Rule's motion to suppress statements to police and evidence obtained after his warrantless arrest.

*Did the Trial Court Err by Denying Rule's Motion to Suppress the Deputy's Identification of Him at the Jail?*

Rule argues that the trial court erred when it denied his motion to suppress the deputy's identification of Rule at the jail. Rule specifically argues that the deputy's identification was unnecessarily suggestive and carried with it a substantial likelihood of misidentification.

This court has held that the term "unnecessarily suggestive" better reflects the standard for admissibility of eyewitness identifications than does the term "impermissibly suggestive." *State v. Reed*, 45 Kan. App. 2d 372, 379-80, 247 P.3d 1074 (2011) (citing

10

*State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 [2006]). For this reason, the term "unnecessarily suggestive" will be used in place of "impermissibly suggestive."

When an appellate court reviews an eyewitness identification, it makes a due process determination involving mixed questions of fact and law. The court determines whether the factual underpinnings of a trial court's decision are supported by substantial competent evidence and then reviews the trial court's legal decisions de novo. *Corbett*, 281 Kan. at 304 (citing *State v. Trammell*, 278 Kan. 265, 270, 92 P.3d 1101 [2004]).

A trial court's decision to admit eyewitness testimony is analyzed by an appellate court using a two-part approach. First, the court determines whether the procedure used to make the identification was unnecessarily suggestive. If the procedure is found to be unnecessarily suggestive, the court moves on to the second part and considers whether the procedure led to a substantial likelihood of misidentification. In analyzing the second part, the court considers the totality of the circumstances surrounding the identification as outlined in *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 (2003). *Trammell*, 278 Kan. at 270-71. The court only reaches the second part of the analysis if it finds that the procedure used to make the identification was unnecessarily suggestive. *State v. Galyardt*, 44 Kan. App. 2d 729, 735, 240 P.3d 619 (2010) (citing *Trammell*, 278 Kan. at 270).

Here, the trial court found that the deputy's pretrial identification of Rule at the jail was not the result of an unnecessarily suggestive procedure and there was not a substantial likelihood of misidentification. We will review those findings individually.

a. *Was the procedure used to make the identification unnecessarily suggestive?*

"A pretrial identification procedure is unnecessarily suggestive when the officers conducting it give the witness information that highlights an individual before the

11

selection is made or make suggestions about who the witness should select." *State v. Lewis*, 299 Kan. 828, 842, 326 P.3d 387 (2014). For example, a photo lineup will be found unnecessarily suggestive if the persons depicted in the lineup do not fit the witness' description or if the suspect's photograph is significantly different than the other photographs in the lineup. 299 Kan. at 842.

One specific type of unnecessarily suggestive identification occurs in what is often referred to as a "show-up" identification. In a "show-up" identification, one person, who is almost always in custody, is identified by an individual who was the victim of a crime a short time before the identification. *Hunt*, 275 Kan. at 815. The United States Supreme Court has shown general displeasure with show-up identifications. See *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967) (holding practice of showing suspects singly to persons for purpose of identification widely condemned), *abrogation recognized on other grounds by Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993). Our Supreme Court has "approved of one-on-one confrontations shortly after the commission of an offense, recognizing that time is crucial when there is an eyewitness who can identify a suspect and that any delay in identification could impede the police investigation." *State v. Alires*, 246 Kan. 635, 640, 792 P.2d 1019 (1990) (citing *State v. Meeks*, 205 Kan. 261, 266, 469 P.2d 302 [1970]).

This court has found a show-up identification procedure unnecessarily suggestive when police asked the victim of an armed robbery to identify a suspect who was in handcuffs in the back of a patrol car. See *Reed*, 45 Kan. App. 2d at 381. But this court has also found that a show-up identification was not unnecessarily suggestive when police informed a witness that they had a suspect in custody and took the witness to see the suspect where he was the only nonlaw enforcement individual in the area. See *Galyardt*, 44 Kan. App. 2d at 735. The *Galyardt* court found that the identification procedure, while suggestive, was not unnecessarily suggestive in light of the identification details the witness provided at the scene. 44 Kan. App. 2d at 735.

12

Rule argues that the procedure leading to the deputy's identification was more suggestive than a one-person show up because the deputy knew that Rule was found and arrested in the vicinity of the stolen truck. Rule also argues that the deputy went to the jail with the "preconceived notion" that he would find the individual that he had seen earlier. Rule offers little authority for his argument other than *Stovall*, 388 U.S. at 302, which stands for the basic proposition that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."

The State urges this court to make a distinction between the deputy as a law enforcement officer and a lay witness in assessing the suggestiveness of the identification procedure. No doubt, the State is extending the reasoning the trial court used in finding that the procedure was not unnecessarily suggestive. The trial court relied heavily on the fact that the deputy was a law enforcement officer and not a victim of the crime. The trial court found the level of suggestibility to be low in light of the fact that the deputy had 20 years of experience as a law enforcement officer. The trial court further found that the deputy was simply performing his duty as a law enforcement officer when he went to the jail to identify Rule.

Here, the deputy was not acting under the direction of any law enforcement officers. The deputy decided on his own to go to the jail. This fact distinguishes the deputy's identification of Rule from traditional examples of show-up identifications. The trial court also noted that the officer was performing a duty when he went to identify Rule. The trial court likened the deputy's identification at the jail to an in-court identification, which the trial court found eliminated the dangers of a show-up. Further, the trial court found that the deputy was not emotionally involved in the case like a victim may be, which decreased the deputy's susceptibility to suggestion. Also not to be ignored is the deputy's testimony that he had been trained on the importance of being positive on identifications and the importance of not making false identifications.

13

The deputy went to the jail to determine whether Rule was the individual he had seen earlier driving the stolen truck. Moreover, the deputy was told about Rule's identity as a suspect before he went to the jail. The deputy went to the booking counter in the jail and asked an officer where he could find Rule. Rule was being kept in the pit area behind the booking counter. The pit holds the inmates who are waiting to be processed. When the deputy asked where he could find Rule, Rule stood up from behind the counter and said, "Here I am."

The identification procedure in the instant case was unnecessarily suggestive. The deputy's identification of Rule occurred in a procedure very similar to a one-person "show-up" identification. The problem here is that the deputy knew that Rule was the person found in the vicinity of the wrecked truck. Moreover, his fellow officers had arrested Rule believing he had committed the alleged crimes. These factors along with Rule standing up from behind the counter and saying, "Here I am," resulted in an unnecessarily suggestive procedure. Thus, the trial court's finding that the deputy was not likely susceptible to suggestion is not supported by substantial competent evidence.

Next, we will consider whether the deputy's identification of Rule carried a substantial likelihood of misidentification.

b. *Did the deputy's identification lead to a substantial likelihood of misidentification?*

The critical element of the identification analysis is whether the identification is reliable. *Hunt*, 275 Kan. at 815 (citing *State v. Shumway*, 30 Kan. App. 2d 836, Syl. ¶ 5, 50 P.3d 89 [2002]); *accord Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). If the identification is found to be reliable and no substantial likelihood of misidentification is present, the jury must determine whether the evidence is

14

reliable enough to support conviction. *Corbett*, 281 Kan. at 305 (citing *Brathwaite*, 432 U.S. at 116).

Under the second part of the analysis, this court considers the totality of the circumstances surrounding the identification as outlined in *Hunt*, 275 Kan. at 817-18. *Trammell*, 278 Kan. at 270-71. The *Hunt* factors to be considered are: "(1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation; (6) the witness' capacity to observe the event, including his or her mental and physical acuity; (7) whether the witness' identification was made spontaneously and remained consistent thereafter or whether it was the product of suggestion; and (8) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *Trammell*, 278 Kan. at 270-71 (citing *Hunt*, 275 Kan. at 815-18).

The trial court concluded that each of the *Hunt* factors weighed in the State's favor in finding that no substantial likelihood of misidentification existed. We will now analyze the *Hunt* factors to determine whether the trial court's factual findings are supported by substantial competent evidence and its legal conclusions are correct.

*The witness' opportunity to view the criminal at the time of the crime*: Here, the deputy first observed the red truck from about 25 yards away. He could see that the red truck had the Landscape Consultants logo on its side. The truck passed about 15 yards in front of the deputy. He saw the driver of the truck from the shoulder up as he passed by. The deputy "got a good look at the driver for about three to four seconds."

*The witness' degree of attention*: The deputy heard a Salina Police Department dispatch put out an attempt to locate a flatbed truck. The deputy was in the area where the

15

truck was last seen. The deputy first saw the truck from about 25 yards away. He saw the truck run a stop sign. The deputy was able to read the Landscape Consultants' logo, which was in 2"-3" lettering on the side of the truck, as it passed. The deputy followed the truck with his eyes for about 150 feet.

*The accuracy of the witness' prior description*: The deputy initially described the driver as a white male in his late 20's or early 30's with short blondish-brown hair and whiskers wearing a white shirt. The deputy's description was similar to the description given by Hammel, who said that the driver was in his mid-20's with short hair. Rule was 29 years old when the crime was committed. Rule was not wearing a white shirt when he was found by police. Rule was, however, the only individual found in the area where the stolen truck had crashed who matched the deputy's general description.

*The level of certainty demonstrated by the witness at the confrontation*: The deputy saw Rule at the jail from a distance of about 12-15 feet. When he saw Rule he had no doubt that Rule was the individual he had seen driving the stolen truck. In fact, the deputy testified that when he saw Rule at the jail he was "100%" sure that Rule was the individual he had seen driving the stolen truck. Rule argues that this factor is neutral because the deputy was not asked to make an identification.

*The length of time between the crime and the confrontation*: About 2 hours had passed between the time the deputy saw the individual driving the stolen truck and the time the deputy identified Rule at the jail. Rule concedes that this point does not weigh in his favor.

*The witness' capacity to observe the event, including his or her mental and physical acuity*: The deputy had worked in law enforcement for 20 years before he witnessed Rule driving the stolen truck. The deputy had received law enforcement training at the Kansas Law Enforcement Training Center. Rule concedes that the officer's

16

mental acuity was very strong when the crime occurred. Rule argues, however, that the officer's physical acuity was limited by the bright, glare of day and the high speed of the passing truck. Rule argues that this factor is neutral.

*The spontaneity and consistency of the witness' identification and the susceptibility to suggestion*: The trial court found that any susceptibility to suggestion would be inherent in the fact that Rule was in jail and in police custody. The trial court found the level of susceptibility to suggestion to be low because the deputy was doing what he was trained to do. Rule argues that the identification was not spontaneous because the deputy "potentially had some view" of Rule before he asked about him at the booking counter. This argument is not supported by the evidence in the record. When the deputy entered the jail, he went to the booking counter. Rule was in the pit, a depressed area that sits behind and below the booking desk. Rule was sitting on a bench in the pit. The deputy could not initially see Rule because his view was obstructed by a copy machine. The deputy identified Rule as the driver of the stolen vehicle as soon as he stood up from behind the copy machine. Thus, the record shows that the identification was spontaneous.

*The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly*: The trial court found that the deputy had a sufficient opportunity to view the events when he was stationary and the truck passed. As was established earlier, the deputy was a trained law enforcement officer with 20 years of experience. The deputy's strong mental acuity was conceded by Rule. Thus, the deputy was likely to be able to observe, perceive, remember, and relate the event he witnessed correctly.

After reviewing the totality of the circumstances surrounding the deputy's identification of Rule as the individual he witnessed driving the stolen truck, it is clear that the trial court's finding that the identification did not carry a substantial risk of misidentification is supported by substantial competent evidence. The trial court relied

17

heavily on the deputy's law enforcement training and experience. The trial court found that all eight *Hunt* factors weighed in favor of finding no substantial risk of misidentification existed.

One additional argument that Rule makes must be addressed. Rule argues that "[t]he case against [him] was based nearly entirely off [the deputy's] impermissibly [*sic*] suggestive post-arrest identification of him as the perpetrator of numerous crimes, even though this identification lacked sufficient indicia of reliability . . . and carried a substantial likelihood of misidentification." The record on appeal does not support Rule's assertion that the case against him was almost entirely based on the deputy's identification of Rule as the driver of the stolen truck. The trial court noted at the hearing on Rule's motion to suppress that "had that Deputy not identified [Rule] at the jail, there was still probable cause to arrest him and bind him over . . . ."

Moreover, the trial court issued a cautionary instruction relating to the eyewitness identification. The trial court instructed the jury on six factors it was to use in considering the accuracy of eyewitness testimony. The instruction also clearly stated that the burden to prove the identity of the defendant was squarely on the State and the defendant was not at all required to prove he was wrongly identified. Such an instruction is a generally recognized safeguard against the introduction of eyewitness identifications. See *Perry v. New Hampshire*, 565 U.S. __, 132 S. Ct. 716, 730, 181 L. Ed. 2d 694 (2012).

In conclusion, even if the identification procedure was unnecessarily suggestive, the reliability of the deputy's identification outweighs such suggestiveness. Therefore, the trial court properly denied Rule's motion to suppress the deputy's identification of Rule at the jail.

*Did the Trial Court Err by Not Instructing the Jury on Attempted Aggravated Assault?*

The trial court shall instruct the jury on lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense. K.S.A. 2015 Supp. 22-3414(3). *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014). This duty to instruct is triggered by the defendant's request and applies even if the evidence is weak, inconclusive, and consists solely of the defendant's testimony. *State v. Maestas*, 298 Kan. 765, Syl. ¶ 6, 316 P.3d 724 (2014).

When reviewing a trial court's failure to give a lesser included offense instruction, appellate courts apply the following three-step analysis: (1) determine whether an appellate court lacks jurisdiction to consider the issue or the party failed to preserve the issue; (2) consider the merits of the claim to determine whether an error occurred at trial; and (3) determine whether any error was harmless or requires reversal. *State v. Dupree*, 304 Kan. 377, 391-92, 373 P.3d 811 (2016).

Thus, it must first be determined whether this court has jurisdiction to consider the issue and whether Rule properly preserved the issue for appeal. When a trial court fails to give an instruction on a lesser included offense, a party properly preserves the issue for appeal by requesting the lesser included offense instruction and distinctly stating the grounds for its inclusion. See K.S.A. 2015 Supp. 22-3414(3) (establishing preservation rule for lesser included crime instructions.); *State v. Roeder*, 300 Kan. 901, 920, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

Here, Rule clearly requested that the jury instruction for the lesser included offense of attempted aggravated assault be given to the jury. The trial court failed to instruct on the lesser included offense of attempted aggravated assault. Thus, Rule properly preserved the issue for appeal and this court has jurisdiction. The State concedes this point.

Next, we must consider the merits of Rule's claim to determine whether an error occurred. In considering the merits, this court employs unlimited review of the entire record to consider whether the requested instruction on the lesser included offense was legally and factually appropriate. *Dupree*, 304 Kan. at 392. If the appellate court finds the instruction was legally and factually appropriate, the trial court's failure to give the instruction was error. *State v. Cooper*, 303 Kan. 764, 770, 366 P.3d 232 (2016). An appellate court has unlimited review to determine whether an instruction on a lesser included offense is legally appropriate. *State v. Charles*, 304 Kan. 158, 165, 372 P.3d 1109 (2016).

Generally, an attempt is an overt act toward perpetrating a crime done by a person intending to commit such crime but failing in the perpetration thereof or who is prevented or intercepted in executing such crime. K.S.A. 2015 Supp. 21-5301(a). Rule argues that K.S.A. 2015 Supp. 21-5301(a) means that "it is always legally appropriate to instruct on the attempted version of a crime." Without determining whether it is *always* legally appropriate to instruct on attempt as a lesser included offense, it should be noted that our Supreme Court has recognized attempted aggravated assault as a crime in Kansas. See *State v. Spencer*, 264 Kan. 4, 8, 954 P.2d 1088 (1998). Thus, an instruction for the lesser included offense of attempted aggravated assault would be legally appropriate.

Even if an offense includes a lesser included offense, a trial court's failure to instruct on the lesser included offense is erroneous only if the instruction would have been factually appropriate under K.S.A. 2015 Supp. 22-3414(3); see *State v. Molina*, 299 Kan. 651, 661, 325 P.3d 1142 (2014). When evaluating whether a lesser included instruction is factually appropriate in the individual case, the standard of review is "[i]f, after a review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty of the lesser crime, failure to give the instruction is error." *State v. Fisher*, 304 Kan. 242, 258, 373 P.3d 781 (2016).

20

The State echoes the trial court's finding in asserting that it was not factually appropriate to instruct on the lesser included offense of attempted aggravated assault because if there is no evidence that the defendant failed in the perpetration of the charged crimes and the completed crimes were clearly established, there is no need for an instruction on attempt. *State v. Grauerholz*, 232 Kan. 221, 230, 654 P.2d 395 (1982) (citing *State v. Buggs*, 219 Kan. 203, 206, 547 P.2d 720 [1976]).

The trial court also noted that *Spencer* provides that attempted aggravated assault is available in narrow situations. It must be noted, though, that in *Spencer*, our Supreme Court was analyzing an assault statute quite different than the current statute. The assault statute in *Spencer* defined assault as "'an intentional threat or attempt to do bodily harm to another coupled with apparent ability and resulting in immediate apprehension of bodily harm. . . .' [Citation omitted.]" *Spencer*, 264 Kan. at 8. Our current assault statute simply states that "[a]ssault is knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2015 Supp. 21-5412(a). The *Spencer* court found that a defendant could not be convicted of an attempt to attempt to do bodily harm. 264 Kan. at 8. Our current assault statute, however, no longer contains the word "attempt" in it, so *Spencer*'s application is limited.

Instead, we must look to the general principle from K.S.A. 2015 Supp. 21-5301(a) that an attempt is an overt act toward perpetrating a crime done by a person intending to commit such crime but failing in the perpetration thereof or who is prevented or intercepted in executing such crime. This rings true with the proposition from *Grauerholz* that if there is no evidence that the defendant failed in the perpetration of the charged crimes and the completed crimes were clearly established, there is no need for an instruction on attempt. 232 Kan. at 230. Finally, though its application is limited, *Spencer* still provides an example of attempted aggravated assault where a defendant swings a pool cue at another individual but is brought under control before getting close enough to the individual to cause apprehension of bodily harm. 264 Kan. at 8.

21

Rule argues that the attempted aggravated assault instruction was factually appropriate because the threat in this case did not result in Hammel's immediate apprehension of bodily harm based on the evidence presented. Rule argues that Hammel was only a little shook up and that the State failed to present other evidence on whether Hammel was placed in immediate apprehension of bodily harm. Rule's argument does not include all the evidence in the record relating to whether Hammel was placed in immediate apprehension of bodily harm.

Here, the evidence does not tend to show that a rational factfinder could have found Rule guilty of attempted aggravated assault. The facts relating to the charge of aggravated assault are mostly undisputed. Hammel saw an unauthorized person driving his work truck. He went out to confront the driver. As Hammel walked down the sidewalk toward the truck, the driver saw him coming. The driver turned the wheels of the truck at Hammel and accelerated over the curb in his direction. Hammel testified that the driver looked right at him as he was driving toward him. Hammel had to take two or three big steps to get out of the way of the truck. He estimated that the truck came within 3 or 4 feet of him, an estimate that was echoed by another eyewitness to the event. Hammel estimated that the truck was traveling around 10 miles per hour when it came near him. If he had not moved, he would have been hit by the truck. Hammel was shaken up by the experience. He was not only psychologically shaken, but he was physically shaking so bad after the incident that he found it difficult to unlock his cell phone to call 911. Rule's attempt to minimize Hammel's reaction to the event falls short in light of all the evidence in the record.

After review of the record, there is no factual indication that Rule failed to perpetrate the crime of aggravated assault or was prevented or intercepted in the commission thereof. See K.S.A. 2015 Supp. 21-5301(a). Instead, the evidence supports the proposition that the completed crime of aggravated assault was clearly established,

22

which means there is no need for an instruction on attempt. See *Grauerholz*, 232 Kan. at 230.

Moreover, Rule's argument that Hammel was not placed in immediate apprehension of bodily harm presents a unique situation. Assault is defined as "knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2015 Supp. 21-5412(a). If Rule wholeheartedly believes that no immediate apprehension of bodily harm resulted from his actions, then requesting an instruction on the lesser included offense of attempt makes little sense. For if the evidence presented showed that Hammel was not placed in apprehension of immediate bodily harm, then Rule would not have been convicted of assault at all.

In any event, the facts in the record on appeal show that the instruction of the lesser included offense of attempted aggravated assault was not factually appropriate. Thus, the trial court properly refused to instruct the jury on the lesser included offense.

*Was Rule's Conviction for Aggravated Assault Supported by Sufficient Evidence?*

Normally, when reviewing whether sufficient evidence to support a conviction exists in a criminal case, the appropriate standard is whether after reviewing all evidence in a light most favorable to the prosecution an appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, an appellate court will not usually reweigh the evidence or credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). A defendant's conviction will only be reversed in rare cases where the testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

There is no doubt from the record on appeal that Rule challenged the sufficiency of the evidence in numerous motions at the trial court level. A criminal defendant is not required to challenge the sufficiency of the evidence at the trial court level in order to preserve the issue for appeal. *State v. Wells*, 297 Kan. 741, 757, 305 P.3d 568 (2013) (quoting *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 [2008]). It is worth noting that Rule did not advance the argument at the trial court level that he is currently raising.

Rule's argument on appeal does not truly challenge the sufficiency of the evidence. Rather, Rule essentially challenges whether theft can be an aggravating factor for the purpose of a conviction of aggravated assault with the intent to commit a felony. Specifically, Rule argues that theft is not a continuing crime, so he could not have assaulted Hammel with the intent to commit felony theft because the theft had already been completed when the assault occurred. In a way, Rule is almost arguing that it was legally impossible for him to have been convicted of aggravated assault with the intent to commit theft.

Generally, issues not raised before the trial court cannot be raised on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Yet, our courts have allowed alternative means issues to be heard for the first time on appeal because the issues necessarily implicate whether sufficient evidence existed to support a conviction. *State v. Cheffen*, 297 Kan. 689, 699, 303 P.3d 1261 (2013). In *Cheffen*, the appellant acknowledged that he was raising his argument for the first time on appeal but insisted the issue be heard because it implicated his fundamental right to a unanimous jury verdict. Our Supreme Court noted that the State did not argue the preservation issue, which raised a question as to whether the State had waived it. 297 Kan. at 699. Nonetheless, our Supreme Court took up the issue because of the fact that it implicated the sufficiency of the evidence. 297 Kan. at 699.

Nevertheless, because Rule's argument hinges on whether the State proved all elements of the crime as charged, we determine that it is similar enough to *Cheffen* to warrant consideration.

As presented, Rule's argument requires this court to engage in statutory interpretation. The interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). First, an appellate court must attempt to ascertain that intent through plain language of the statute, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016).

Rule was convicted of aggravated assault with the intent to commit felony theft. The offense of aggravated assault with the intent to commit a felony is defined as "knowingly placing another person in reasonable apprehension of immediate bodily harm . . . with the intent to commit any felony." K.S.A. 2015 Supp. 21-5412(b)(3). Theft is defined as obtaining or exerting unauthorized control over property or services with the intent to permanently deprive the owner of the possession, use or benefit of the owner's property or services. K.S.A. 2015 Supp. 21-5801(a)(1). Theft by obtaining or exerting unauthorized control over property with intent to deprive the owner permanently of possession, use, or benefit of his or her property is not a continuing offense. *State v. Kunellis*, 276 Kan. 461, 469, 78 P.3d 776 (2003) (quoting *State v. Gainer*, 227 Kan. 670, 672-74, 608 P.2d 968 [1980]). The element of asportation is not required to complete the theft. 276 Kan. at 469 (quoting *State v. Knowles*, 209 Kan. 676, 678, 498 P.2d 40 [1972]).

*Kunellis* may be distinguished from our case at hand. In *Kunellis*, the defendant was being charged with felony murder based on the underlying felony of theft. There, felony murder was defined as the killing of a human being committed in the commission

25

of, attempt to commit, or flight from an inherently dangerous felony. 276 Kan. at 475. Our Supreme Court held that a conviction of felony murder following theft can only be based upon "'flight from'" the completed crime. 276 Kan. at 468.

Here, we are not dealing with a charge of felony murder. Instead, we are dealing with a charge of aggravated assault. And where the felony-murder statute in *Kunellis* required the killing to have been committed in the commission of, attempt to commit, or flight from the theft, our statute only requires that the aggravated assault be committed with the intent to commit theft. See K.S.A. 2015 Supp. 21-5412(b)(3). This court has held that in the case of an aggravated burglary with the intent to commit theft, the State had to prove as a material element that a defendant had the intent to commit theft, not that the defendant actually committed the offense. *State v. LeGrand*, No. 108,389, 2013 WL 6331597, at *15 (Kan. App. 2013) (unpublished opinion), *rev. denied* 301 Kan. 1050 (2015). Thus, where *Kunellis* was more concerned about when the theft was committed and whether it was ongoing, we are concerned with whether Rule had the requisite intent to commit theft when the assault of Hammel occurred.

When the record on appeal is examined it becomes clear that sufficient evidence existed to support a finding that Rule had the requisite intent to commit theft when the assault occurred. Rule is correct in that the crime of theft was complete when he obtained unauthorized possession of the truck, but Rule is incorrect in asserting that simply because the commission of the theft was complete, he lacked the intent to commit theft. Plainly put, had Rule lacked the intent to commit theft when Hammel confronted him on the street, Rule would have returned the truck to Hammel's possession without issue. Instead, Rule used the truck to commit an aggravated assault on Hammel. The evidence in the record on appeal is sufficient to support this conviction.

Thus, Rule's conviction for aggravated assault with the intent to commit theft was supported by sufficient evidence, even though the commission of the theft had been completed when the assault occurred. For this reason, Rule's argument fails.

*Did the Trial Court Err in Not Arresting Judgment on Rule's Theft Charge?*

On July 15, 2016, our Supreme Court heard a case that had major implications for our review of motions to arrest judgment. See *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Rule filed his brief with our court on March 21, 2016. Thus, Rule's analysis of this issue is mostly based on the standards set out in *State v. Hall*, 248 Kan. 728, 793 P.2d 737 (1990), the very case that *Dunn* overturned. The State did not file its brief until August 24, 2016. So, the State's analysis of the issue is mostly based on the standards set out in *Dunn*. We will address this issue under the *Dunn* holding.

Here, Rule argues that "the mental state required for the commission of theft was an 'essential element' of theft, and the State erred by failing to include it in its complaint, and the district court lost jurisdiction to consider whether . . . Rule committed that crime because the complaint didn't include it."

When reviewing a criminal case, an appellate court's essential task is determining if the proceeding was so imperfect as to be unfair. *Dunn*, 304 Kan. at 775. The standard of review for evaluating assertions of errors in charging documents is de novo. 304 Kan. at 819. Our Supreme Court pointed out in *Dunn* that "[c]harging documents do not bestow or confer subject matter jurisdiction on state courts to adjudicate criminal cases; the Kansas Constitution does." 304 Kan. at 811. The court also expressly overruled the proposition that a charging document must include all essential elements of the charged offense to avoid being insufficient. 304 Kan. at 811.

Instead, the *Dunn* court focused on the plain language of K.S.A. 22-3201(b), which governs charging documents. "A charging document shall state 'essential facts' constituting the crime charged, and the document 'shall be deemed sufficient' if it is 'drawn in the language of the statute.'" 304 Kan. at 811 (quoting K.S.A. 22-3201[b]). Thus,

"[a] charging document's failure to include an element of a crime under the defining Kansas statute does not deprive the court of subject matter jurisdiction to convict; it does not even necessarily meet the statute-defined threshold for failure to charge a crime because the facts alleged, rather than the legal elements regurgitated, determine whether the charge is sufficient under the statute defining the crime." 304 Kan. at 819-20.

Kansas courts now recognize three types of charging document defects. First, a charging document is defective when it fails to show that the Kansas Constitution's requirement that the document be filed in the correct court and territory has been satisfied. Second, a charging document is defective when it fails to allege facts that, if proven beyond a reasonable doubt, show the commission of a Kansas crime as required by state statutes. And third, a charging document is defective when it fails to meet the constitutional standards of providing the defendant with due process and adequate notice of the charges. The first defect creates a state constitutional error; the second defect creates a state statutory error; and the third defect creates a violation of federal and state constitutional rights. *Dunn*, 304 Kan. at 815.

In *Dunn*, the defendant challenged his conviction for forgery based on the fact that the charging document failed to allege that he intended to defraud his alleged victims. The statute defining forgery required the alleged forgery to have been undertaken knowingly and with the intent to defraud. 304 Kan. at 820 (citing K.S.A. 21-3710). Thus, the defendant argued that the charging document failed to include all essential elements of the crime charged. Our Supreme Court found that the State had failed to charge forgery where the count alleging forgery failed to include the statutorily required mental

28

state. 304 Kan. at 821. The court ultimately found that the error was harmless because the charging document was sufficient to make the defendant and his trial counsel understand exactly what the State sought to prove relating to the alleged forgery. 304 Kan. at 821.

Here, Rule makes a similar challenge to his charging document, arguing that the State failed to allege a mental state in its charge for theft under K.S.A. 2015 Supp. 21-5801. Rule specifically argues that the charging document fails to allege a mental state for the act of "obtaining or exerting." Rule argues that even when a mental state is not included in a statute, the State must prove that the defendant acted intentionally, knowingly, or recklessly, as stated in K.S.A. 2015 Supp. 21-5202.

Rule misreads the theft statute as failing to list a mental state. The statute for theft states that "(a) [t]heft is any of the following acts done with *intent to permanently deprive* the owner of the possession, use or benefit of the owner's property of services: (1) obtaining or exerting unauthorized control over property or services." (Emphasis added.) K.S.A. 2015 Supp. 21-5801(a)(1). Thus, it is plain from the reading of the statute that the "obtaining or exerting" must be done with "intent to permanently deprive" or done intentionally.

As it related to the charge of theft, Rule's charging document read:

"that on or about the 25th day of August, 2014, in Saline County, Kansas, Steven Matthew Rule Jr, then and there being present did unlawfully and feloniously obtain and exert unauthorized control over property or services worth at least $1,000.00 but less than $25,000.00, to-wit: 2000 Ford F-350 . . . *with the intent to permanently deprive* the owner, to-wit: Landscape Consultants; of the possession, use or benefit of such property or services." (Emphasis added.)

The charging document here perfectly mimics the language of the statute, only inserting relevant facts to provide Rule with sufficient notice of the crime with which he

29

was being charged. Thus, unlike the charging document in *Dunn*, the charging document here did not fail to allege the crime charged because it did not fail to include an essential element. The mental state required by the statute was intentionally—or with the intent to permanently deprive.

In challenging that the charging document does not allege a mental state for the act of obtaining or exerting, Rule goes as far as to wonder whether an individual who "accidentally" obtains or exerts control over another's property could be charged with theft. That question is easily answered by reading the statute defining theft, which clearly states that an individual can only be charged with theft if he or she is found to have obtained or exerted unauthorized control over property or services with the intent to permanently deprive. See K.S.A. 2015 Supp. 21-5801. And it is difficult to conjure up a situation where an individual accidentally intends to permanently deprive another of his or her property. Thus, the obtaining or exerting of unauthorized control must have been done intentionally—just as the charging document here laid out.

Here, the charging document mimicked the language from the statute defining theft and alleged facts that if proven beyond a reasonable doubt would support a finding that a Kansas crime was committed. Furthermore, the charging document alleged a mental state for the obtaining or exerting of unauthorized control, contrary to Rule's argument. As required by K.S.A. 2015 Supp. 21-5801, the theft statute, the charging document clearly stated that the obtaining or exerting of unauthorized control must have been done with the intent to permanently deprive. Moreover, it cannot be said that Rule and his trial counsel were unaware of the crime being charged. For these reasons, the trial court did properly denied Rule's motion for arrest of judgment on the theft charge.

Affirmed.